# In the United States Court of Federal Claims

No. 13-131 C

(E-Filed Under Seal:  May 23, 2013)[1]
(E-Filed with Redactions:  June 12, 2013)

_____

)
)
MIL-MAR CENTURY CORP., )
)
                Plaintiff, )
)    Post-Award Bid Protest; Claims
v. )    by Incumbent Contractor of
)    Improper Technical Evaluation of
THE UNITED STATES OF AMERICA, )    Proposals, Unequal Discussions,
)    Improper Price Realism Analysis,
                Defendant, )    and Flawed Best Value Analysis
)
& )
)
THE ENTWISTLE CO., )
)
                Defendant-Intervenor. )
)
_____ )

Barbara Ann Duncombe, Dayton, OH, for plaintiff.  Suzanne Sumner, Tricia C. Bell, Casie E. Hollis and Joshua D. Prentice, Dayton, OH, of counsel.

Barbara E. Thomas, Trial Attorney, with whom were Stuart F. Delery, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States

---

[1]  This Opinion was filed under seal on May 23, 2013, Docket Number (Dkt. No.) 44. The court instructed the parties to file any requests for the redaction of protected material on or before June 5, 2013.  Id. at 1, n.1.  In response to the court's directive of May 23, 2013, plaintiff timely filed Plaintiff's Motion to Redact the Court's Opinion, Dkt. No. 46, and defendant filed Defendant's Unopposed Motion for Leave to File Proposed Redactions Out of Time (defendant's Motion for Leave), Dkt. No. 47.  In an order dated June 6, 2013, the court granted defendant's Motion for Leave and ordered defendant to "file a motion to redact protected materials on or before Monday, June 10, 2013."  Order of June 6, 2013, Dkt. No. 48.  In response to the court's directive of June 6, 2013, defendant timely filed Defendant's Motion to Redact Protected Material Contained in the Court's Sealed May 23, 2013 Opinion, Dkt. No. 49.  The parties' motions to redact are GRANTED.

Department of Justice, Washington, DC, for defendant. <u>Wade L. Brown</u>, Associate Command Counsel, and <u>George W. Day</u>, Attorney-Advisor, United states Army TACOM, of counsel.

<u>Henry E. Steck</u>, Fort Worth, TX, for defendant-intervenor.

OPINION

HEWITT, Chief Judge

This is a post-award bid protest brought by plaintiff Mil-Mar Century Corp. (Mil-Mar or plaintiff), the incumbent contractor responsible for designing and manufacturing Load Handling System Compatible Water Tank-Rack Systems (known as Hippos). <u>See</u> Compl. for Declaratory and Injunctive Relief (Complaint or Compl.), Docket Number (Dkt. No.) 1, ¶¶ 2, 14-17. Plaintiff protests the award by the Army Contracting Command-Warren (the Agency) to The Entwistle Company (Entwistle or intervenor) of a contract valued at $69 million for the production of Hippos. <u>See</u> <u>id.</u> ¶¶ 2, 16. Plaintiff contends that "[t]he Agency's actions were irrationally based, arbitrary, capricious, and contrary to applicable statutes and regulations." <u>Id.</u> ¶ 4.

Before the court are plaintiff's Complaint, filed February 20, 2013; Plaintiff's Motion and Memorandum in Support of Motion for Judgment upon the Administrative Record (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 28, filed March 18, 2013[2]; Defendant-Intervenor's Response Opposing Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record with Supporting Memorandum (intervenor's Motion or Intervenor's Mot.), Dkt. No. 29, filed April 1, 2013; Defendant's Opposition to Plaintiff's Motion for Judgment upon the Administrative Record and Cross-Motion for Judgment upon the Administrative Record

---

[2] Plaintiff's Motion and Memorandum in Support of Motion for Judgment upon the Administrative Record (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 28, filed March 18, 2013, seeks to "incorporate[] . . . by reference" facts and arguments from plaintiff's Memorandum in Support of Plaintiff's Motion for Preliminary Injunction (plaintiff's Motion for Preliminary Injunction), Dkt. No. 5. <u>See, e.g.</u>, Pl.'s Mot. 2 n.1, 6 n.3, 15 n.7. The court denied plaintiff's Motion for Preliminary Injunction in an order dated February 21, 2013. Order of Feb. 21, 2013, Dkt. No. 16. Rule 5.4(b)(3) of the Rules of the United States Court of Federal Claims (RCFC) provides, "A party must not incorporate a brief or memorandum by reference; the court will disregard any such incorporation." RCFC 5.4(b)(3). The court therefore disregards the attempt by Mil-Mar Century Corp. (Mil-Mar or plaintiff) to incorporate by reference all or any portion of plaintiff's Motion for Preliminary Injunction. <u>Cf.</u> Def.'s Opp'n to Pl.'s Mot. for J. upon the Admin. R. & Cross-Mot. for J. upon the Admin. R. (defendant's Motion or Def.'s Mot.), Dkt. No. 30, at 2 n.1 (objecting "to plaintiff's attempts to evade the page limitations set forth in the Court's rules--and agreed upon during the initial status conference in this litigation--by 'incorporating' portions of other filings into its motion for judgment").

(defendant's Motion or Def.'s Mot.), Dkt. No. 30, filed April 1, 2013; Plaintiff's Response to Defendant's Motion for Judgment upon the Administrative Record (Pl.'s Resp.), Dkt. No. 31, filed April 8, 2013; Defendant-Intervenor's Reply to Plaintiff's Response, Dkt. No. 32, filed April 15, 2013; and Defendant's Reply in Support of Its Cross-Motion for Judgment upon the Administrative Record (Def.'s Reply), Dkt. No. 34, filed April 15, 2013.

The United States (the government or defendant) filed the Administrative Record (AR) on March 4, 2013, see Def.'s Notice of Filing of Admin. R., Dkt. No. 25, and the court granted Defendant's Consent Motion for Leave to File Corrected Administrative Record, Dkt. No. 26, on March 11, 2013, see Order of Mar. 11, 2013, Dkt. No. 27. The parties completed briefing on April 15, 2013, and the court held oral argument on Friday, April 19, 2013 at 10:00 a.m. Eastern Daylight Time.[3] See Order of Feb. 21, 2013, Dkt. No. 14, at 2.

Plaintiff argues that "[t]he Agency improperly and unequally evaluated [Entwistle's] technical proposal, conducted unequal discussions, . . . conducted an improper price realism analysis" and conducted a flawed best value analysis. Compl. ¶ 3. Defendant counters that, despite plaintiff's "flurry of arguments to the contrary," Def.'s Mot. 17, the Agency "acted reasonably and in accordance with the solicitation at each stage of its Hippo procurement," Def.'s Reply 1.

For the reasons stated below, plaintiff's Motion is DENIED, and the Motions of defendant and intervenor are GRANTED.

I.      Background[4]

        A.      The Solicitation

On March 20, 2012 the Agency issued Solicitation No. W56HZV-11-R-0171 (the Solicitation or Request for Proposals (RFP)), a 100% small business set aside that sought proposals for a firm fixed-price, three-year Indefinite Delivery/Indefinite Quantity contract for the manufacture and supply of Hippos. Compl. ¶ 16, 28. See generally AR 71-281 (RFP). Hippos are framed stainless steel water tanks, see AR 488, 490-91 (Hippo

_____

[3] The oral argument held on Friday April 19, 2013 was recorded by the court's Electronic Digital Recording (EDR) system. The times noted in citations to the oral argument refer to the transcript of the EDR record of the oral argument (Tr.).

[4] The facts are taken from plaintiff's Complaint for Declaratory and Injunctive Relief (Complaint or Compl.), Dkt. No. 1, the corrected Administrative Record, see Dkt. Nos. 25-27, plaintiff's Motion and defendant's Motion. Unless otherwise noted, the facts do not appear to be in dispute.

Purchase Description) (stating that the water tank was to be made of stainless steel and describing frame requirements), that are "capable of transporting 2000 gallons of potable water, and can operate at temperatures of -25 degrees Fahrenheit,"[5] AR 72 (RFP). The frame of a Hippo water tank is designed to "meet International Organization for Standardization (ISO) container requirements to allow stacking of tankracks and meet requirements of worldwide intermodal shipping." AR 480 (Hippo Purchase Description). In addition to water tanks and frames, Hippos are equipped with heating devices, hose reels, water pumps and engines. Id. at 480, 494.

The Solicitation represented the first competitive procurement for Hippos. AR 1767 (Initial Price Evaluation Report (Initial PER)). All previous procurements had been awarded to plaintiff on a sole-source basis.[6] Compl. ¶ 14. Although the Agency considered its contracts with Mil-Mar successful, the Agency found "no compelling reason to believe" that its contracts with Mil-Mar yielded "the optimum in price." AR 2665 (Acquisition Plan).

The Solicitation provided that the offeror selected for award would be required to have "six First Article Testing (FAT) units" approved by the Agency before the Agency ordered production of the remaining units. AR 72 (RFP). Once the Agency approved the FAT units, the selected offeror would be responsible for producing up to 311, 260 and 274 Hippos in the first, second and third years of production, respectively, id. at 76, at an estimated maximum production rate of thirty-five Hippos a month, id. at 72. The selected offeror would also be responsible for developing technical manuals for the Hippos. Id. at 132.

Offerors were to submit proposals that would include volumes dedicated to the discussion of three factors: Production Capability, Experience[7] and Price. Id. at 262.

---

[5] Load Handling System Compatible Water Tank-Rack Systems (known as Hippos) "fullfil[] the [United States] Army requirement for . . . mobile hard-wall water tanker[s] to transport and distribute water at the brigade level." AR 2658 (Acquisition Plan).

[6] The first non-competitive Hippo contract was awarded to plaintiff on September 21, 2001. AR 1767 (Initial Price Evaluation Report (Initial PER)). Plaintiff produced fifty-four Hippos under the first contract, which established plaintiff as the original manufacturer of the Hippo. Id. On August 25, 2006, plaintiff was awarded the second non-competitive Hippo contract, pursuant to which plaintiff produced approximately 770 Hippos, and, on December 17, 2010, plaintiff was awarded the third non-competitive Hippo contract, pursuant to which plaintiff produced 469 Hippos. Id.

[7] The primary difference between an agency's evaluation of offerors' experience versus offerors' past performance is that an evaluation of experience "does not consider the quality of the work performance, whereas" evaluation of past performance does. AR 2189 (Procuring Contracting Officer Determination to Waive Past Performance as an Evaluation Factor); see also

Section L of the Solicitation provided offerors with instructions regarding the required content of the proposals, see id., and Section M of the Solicitation provided offerors with information regarding the Agency's evaluation of the proposals, see id. at 276.  The court discusses Section L and Section M of the Solicitation in more detail below.

> 1.      Section L of the Solicitation:  Instructions, Conditions and Notices to Offerors

Section L of the Solicitation provided offerors with instructions, conditions and notices.  Id. at 262.  Section L.4 of the Solicitation discussed what information offerors were to include in the volume dedicated to the Production Capability factor.  Id. at 263.  Under this factor, offerors were to provide letters of commitment from sub-contractors and to address the following considerations:  manufacturing facilities, production approach, key tooling and equipment and time-phased critical path schedule.  Id. at 263.  Plaintiff does not raise any specific arguments related to the Production Capability factor.  See Tr. 58:3-5 (Barbara E. Thomas (Ms. Thomas)) ("Mil-Mar hasn't made any arguments that Entwistle submitted insufficient information about its production capabilities.").

Section L.5 of the Solicitation discussed what information offerors were to include in the volume dedicated to the Experience factor.  AR 264 (RFP).  Under this factor, offerors were to identify up to five "relevant [c]ontracts" that had been performed in the past three years.  Id.  Section L.5.3 defined relevant contracts as those that "are comparable in scope to the requirements of this RFP" and further provided that "relevant Experience with the following scope of work [(SOW)] requirements [would] be assessed by the Government:"  (1) comparable items, or the "[s]upply of sanitary liquid handling and storage systems of a complexity comparable to the Hippo"; (2) technical manuals, or the "[s]upply of Technical Manuals of a complexity comparable to the Technical Manuals required in this RFP"; (3) delivery, or the "[d]elivery of water handling and storage systems of complexity comparable to the Hippo" at a production rate comparable to thirty-five Hippos a month; (4) low temperature requirement, or the production of "sanitary liquid handling and storage systems capable of meeting . . . low-temperature requirements"; and (5) welding, or the "[w]elding [of] stainless steel in accordance with American Welding Society [Standard] D18.3/18.3M."  Id. at 265.  Section L.5.4 provided that, for each of the contracts identified, offerors should include, among other information, copies of the actual SOW provisions of each contract and "[a] discussion of specific similarities between these contract [SOWs] and the [SOW] herein."  Id.  Section L.5.4 also stated that "[f]ailure to provide the information requested under [Section] L.5.4 . . . so that the Government can verify claimed experience may result in a determination

---

AR 2281 (Source Selection Authority (SSA) Final Briefing) (stating that "[f]or purposes of this evaluation, 'past performance' will be interpreted to mean 'experience' and the evaluation will not consider the quality of performance on prior offeror efforts").

that your proposal is unacceptable and the elimination of your proposal from consideration for award." Id.

Section L.6 of the Solicitation discussed the information offerors were to include in the volume dedicated to the Price factor. Id. Under this factor, offerors were to list all proposed prices in a Microsoft Excel spreadsheet labeled as Attachment 16, including proposed material costs, subcontractor costs over $5,000 and labor-related costs (broken down into labor rates and hours). Id. at 265-66; cf. AR 550-54 (Attachment 16 template). Attachment 16 included a Bill of Material, in which offerors were to identify all items with an estimated cost of $500 or more; offerors were allowed to aggregate the total value of items costing less than $500. See AR 266 (RFP); AR 554 (Bill of Material). Section L.6.6 provided that "the Government reserves the right, as a clarification under [Federal Acquisition Regulation (FAR)] 15.306(a), to request additional or more detailed price breakdown data to support its determination of price reasonableness." AR 266 (RFP).

2.      Section M of the Solicitation: Evaluation Factors for Award

Section M of the Solicitation addressed the criteria by which the Source Selection Evaluation Board (SSEB) would evaluate proposals for award. Id. at 276-77; AR 1857 (Contract Review Board Abstract) (discussing the SSEB's role in evaluating proposals). The findings of the SSEB would inform the decision of the Source Selection Authority (SSA), AR 1857 (Contract Review Board Abstract), "the official designated to direct the source selection process and select the Offeror for contract award," AR 277 (RFP); see AR 2341 (Source Selection Organization Chart) (illustrating the relationship between the SSA and the SSEB).

The Solicitation provided that the SSA would evaluate proposals "using a trade-off process to determine which proposal provides the most advantageous and realistic proposal (i.e. best value) considering the three factors: 1) Production Capability, 2) Experience, and 3) Price." AR 276 (RFP). That is, "in selecting the offer which is most advantageous and represents the best value to the Government," the SSA would consider "the relative strengths/weaknesses and risks of each Offeror's proposal in the non-price factors as well as the total evaluated price." Id. The Solicitation provided that the government would award the contract to the offeror that (1) represented the best value to the government, (2) submitted a proposal that met "all the material requirements of [the] solicitation" and (3) met certain responsibility requirements. Id. at 277.

Section M.4 of the Solicitation discussed the relative weight to be given to each factor: "Production Capability is the most important factor and is slightly more important than [E]xperience," with "Experience [being] slightly more important than Price." Id. When combined, the non-price factors would be considered more important than price. Id. at 278. However, the Solicitation provided that--"[n]otwithstanding the relative order

of importance of the evaluation factors as stated"--the Price factor "may be controlling when . . . [t]he advantages of a higher rated, higher price[d] proposal are not considered to be worth the price premium." Id. at 277.

With respect to the volume dedicated to the Production Capability factor, Section M.5 provided that the government would assess "offerors['] capacity to provide for timely delivery of supplies in satisfaction of contract requirements," id. at 278, and offerors would be a assigned a rating of outstanding, good, acceptable, marginal or unacceptable, AR 2412 (Source Selection Plan). With respect to the volume dedicated to the Experience factor, Section M.6 provided that "the Government [would] assess the risk that the offeror [would] successfully meet contract requirements based upon prior experience with the [five SOW] requirements" set forth in Section L.5.3, see AR 278 (RFP), and offerors would be assigned a rating of very relevant, relevant, somewhat relevant or not relevant,[8] AR 2413 (Source Selection Plan); Compl. ¶ 36. Section M.7 addressed the volume dedicated to the Price factor, in which the government would "assess the total evaluated price to the Government." AR 278 (RFP). Section M.7 also provided that the government would evaluate "the reasonableness of the proposed prices to accomplish the solicitation requirements," and that "[t]he Government may reject a proposal which is not realistic, or not reasonable, as to price." Id.; cf. id. (stating that "[r]easonableness exists when an offered price does not exceed what would be incurred by a prudent person in the conduct of competitive business"); infra Part III.D (discussing the Agency's price realism analysis).

Section M of the Solicitation also listed circumstances under which the government could reject proposals. AR 276 (RFP). The Solicitation provided that the government "may" reject proposals that "omit[] significant material data and information required by Section L;" are "unrealistically . . . low in price" and "reflect[] an inherent lack of technical competence or a failure to comprehend the complexity and risks required to perform the solicitation requirements;" or "contain[] any unexplained significant inconsistency between the proposed effort and cost and/or price, which

---

[8] These experience ratings are described by the Source Selection Authority (SSA) as follows:

> [A]n assessment of Very Relevant Experience will be considered to reflect a very low risk of unsuccessful performance[,] . . . an assessment of Relevant Experience will be considered to reflect a low risk of unsuccessful performance[,] . . . an assessment of Somewhat Relevant Experience will be considered to reflect a moderate risk of unsuccessful performance[,] . . . [and] an assessment of Not Relevant Experience will be considered to reflect a high risk of unsuccessful performance.

AR 2281 (SSA Final Briefing); AR 2413 (Source Selection Plan).

implies the offeror . . . has an inherent misunderstanding of the scope of work, or . . . has an inability to perform the resultant contract." Id.

The Solicitation further provided that the government intended to award the contract without conducting discussions. Id. "Where award will be made without discussions, exchanges with Offerors are limited to clarifications as defined in FAR 15.306(a)." Id. Although "the Government reserve[d] the right to hold discussions, if necessary," the Solicitation advised offerors to submit their "best terms with respect to the price and non-price factors." Id.

B.      Responses to the Solicitation and the SSEB's Evaluation of Proposals

Seven offerors submitted proposals in response to the Solicitation:  [* * *], Entwistle, [* * *], [* * *], [* * *], Mil-Mar, and [* * *].  AR 1878 (Source Selection Decision Document (SSDD)).  Proposals were received May 21, 2012; however, on June 6, 2012 the Agency issued amendments to the Solicitation,[9] and the seven offerors submitted modified proposals on June 14, 2012.  Id.; AR 1857 (Contract Review Board Abstract).

The SSEB evaluated the proposals submitted by the seven offerors pursuant to Section M of the Solicitation.  AR 1878 (SSDD); cf. supra Part I.A.2 (discussing Section M).  The SSEB assigned Mil-Mar the highest ratings in both the Production Capability and Experience factors.  AR 1879 (SSDD).  However, Entwistle's total evaluated price of $69,063,943 was approximately [* * *]% lower than that of Mil-Mar's ($[* * *]) and approximately [* * *]% lower than that of the next lowest offeror, [* * *] ($[* * *]).  See id.; see also id. at 1905 (stating that Mil-Mar's total evaluated price was [* * *]% higher than Entwistle's and that the second lowest offeror's price was [* * *]% higher than Entwistle's); AR 1857 (Contract Review Board Abstract) (same).  A chart of the ratings the SSEB assigned each offeror for the Production Capability and Experience factors and each offeror's total evaluated price is below:

| Offeror | Production Capability | Experience | Total Evaluated Price |
| --- | --- | --- | --- |
| [* * *] | Good | Relevant | $[* * *] |
| Entwistle | Good | Relevant | $69,063,943 |
| [* * *] | Good | Relevant | $[* * *] |
| [* * *] | Acceptable | Somewhat Relevant | $[* * *] |
| [* * *] | Marginal | Not Relevant | $[* * *] |
| Mil-Mar | Outstanding | Very Relevant | $[* * *] |

[9]  The amendments to Solicitation No. W56HZV-11-R-0171 (the Solicitation or Request for Proposals (RFP)) issued on June 6, 2012 "clarif[ied] certain matters related to projected delivery requirements."  AR 1878 (Source Selection Decision Document (SSDD)).

| [* * *] | Marginal | Not Relevant | $[* * *] |

AR 1879 (SSDD).

C.     Requests for Clarification

Because Entwistle's total evaluated price was "substantially less than any other offeror's," the government sought "to clarify" Entwistle's pricing. Def.'s Mot. 10; see Pl.'s Mot. 15-16 (stating Entwistle's "extremely low" price "forced the Agency to consider the price realism of Entwistle's proposal to ascertain whether or not it reflected an understanding of the technical requirements of the Hippo or would expose the Government to undue risk"). As described above, see supra Part I.A.1, Section L.6.6 of the Solicitation provided that, pursuant to FAR 15.306(a), the government could "request additional or more detailed price breakdown data to support its determination of price reasonableness" as a clarification, AR 266 (RFP).

On July 25, 2012 the government issued to Entwistle four requests for clarification that, defendant contends, were permissible under FAR 15.306(a) and Section L.6.6 of the Solicitation.[10] See AR 1772-73 (Initial PER); AR 1844-54 (four requests for clarification); cf. supra Part I.A.1 (discussing Section L.6.6). The four requests for clarification are below:

[(1)] Please substantiate your proposed tank and engine price with quotes, invoices, and item/material specifications.

. . . .

[(2)] Please clarify the cost (material and labor) associated with fabricating the ISO frame.

. . . .

[(3)] Please address the discrepancies in your direct labor hours as described below:

   - There is a difference in the assembly hours shown in the [P]rice Volume . . . and the Production [Capability] Volume . . . . Please clarify which assembly hour reference is correct and provide the basis for the total hours identified.

---

[10] Plaintiff contends that two of these exchanges constituted discussions. See Compl. ¶¶ 14-15; Pl.'s Mot. 18-20. The court addresses this dispute in Part III.C below.

- Total direct hours in the Price Volume . . . do not correspond to the direct labor cost . . . . Please clarify hours and cost.

. . . .

[(4)] Please clarify how your proposed labor hours are adequate to carry out the steps necessary for production of the [FAT] items and production quantities.

AR 1773 (Initial PER).

Entwistle responded to the four requests for clarification two days later, on July 27, 2012. Id. at 1772. In response to the first request for clarification, Entwistle attached quotations from its proposed subcontractors for the water tank and engine. Id. at 1773; see id. at 1775 (water tank quotation), 1776 (engine quotation). In response to the second request for clarification, Entwistle stated: "The estimated material cost for the frame is $[* * *]. The estimated labor for fabricating the frame is [* * *] hours." Id. at 1773. In response to the third request for clarification, Entwistle stated: "The [P]rice Volume . . . represents the final [direct labor hour] estimate[]," and that "[t]he total direct [labor] hours in the Price Volume . . . should reflect [* * *] hours"; Entwistle also attached a corrected Attachment 16 that incorporated the clarification to its total direct hours. See id. (showing attachment); see id. at 1777 (corrected Attachment 16); AR 1833 (Entwistle Price Evaluation Report (Entwistle PER)) (addressing Entwistle's response to the third request for clarification). In response to the fourth request for clarification, Entwistle stated: "The production labor hours were estimated for each labor category based on our understanding of the solicitation requirements. Based on our experience with design programs, a factor was applied to the production hours to arrive at the first article labor hours." AR 1774 (Initial PER).

D.    Price Evaluation Reports

After the Agency received Entwistle's responses to its requests for clarification, the SSEB prepared the following price evaluation reports: (1) the Initial Price Evaluation Report, dated July 31, 2012, which was prepared as to all offerors, see AR 1765 (Initial PER); (2) the Price Evaluation Report, dated August 8, 2012, and the Addendum to the Price Evaluation Report, dated August 15, 2012, which were specific to Entwistle, see AR 1782 (Entwistle PER); AR 1832 (Addendum to the Entwistle Price Evaluation Report (Entwistle PER Addendum)); and (3) the Final Price Evaluation Report, dated August 23, 2012, which was prepared as to all offerors, see AR 1835 (Final Price Evaluation Report (Final PER)). The court discusses each evaluation report, in turn, below.

1.    The Initial Price Evaluation Report

The SSEB prepared the Initial Price Evaluation Report in accordance with Section M.7.1 of the Solicitation, which required the government to assess "'the reasonableness of the proposed prices to accomplish the solicitation requirements.'" AR 1766 (Initial PER) (quoting Section M.7.1 of the Solicitation); cf. AR 278 (RFP) (stating that "[r]easonableness exists when an offered price does not exceed what would be incurred by a prudent person in the conduct of competitive business"). The SSEB concluded that each offeror's total proposed price was reasonable based on adequate price competition. AR 1768-70 (Initial PER); cf. id. at 1767 (defining "adequate price competition" under FAR 15.403-1(c)(1)).

"For evaluation purposes to test price realism," the SSEB reviewed "five major items from each offeror's Bill of Material [in Attachment 16]": the frame, water tank, engine, hose reel and pump. Id. at 1768. The SSEB verified that, with the exception of Entwistle and [* * *], all of the offerors included the costs of each of these five items in their Bill of Material. See id. at 1768-70. Although Entwistle failed to include the cost of the frame in its Bill of Material, the SSEB verified that this was because Entwistle planned to "build and fabricate the frame" rather than purchase it.[11] See id. at 1768.

Moreover, recognizing that Entwistle's price was "very low in comparison to the other offerors as well as in comparison to past history," the SSEB attempted to verify certain information in Attachment 16 of Entwistle's Price Volume. Id. For example, the SSEB verified Entwistle's proposed cost of the water tank "via telephone with the tank vendor." Id. Notwithstanding the fact that Entwistle's "total price appear[ed] to be very low," the SSEB concluded that it "ha[d] no basis to question the reasonableness of the total price offered by Entwistle." Id.

2.  The Entwistle Price Evaluation Report and Addendum to the Entwistle Price Evaluation Report

On August 8, 2012 the SSEB prepared a Price Evaluation Report specific to Entwistle, in which the SSEB evaluated Entwistle's proposal "for reasonableness and realism." AR 1782-83 (Entwistle PER). On August 15, 2012 the SSEB prepared an Addendum to the Price Evaluation Report, in which the SSEB "provide[d] additional evaluation and analysis of Entwistle's responses to the Government's requests for clarification[]."[12] AR 1832 (Entwistle PER Addendum); cf. supra Part I.C (discussing

_____

[11] Similarly, [* * *] did not include the cost of either the water tank or the frame in its Bill of Material because it planned to "build[] and fabricat[e] the tank and frame." See AR 1769-70 (Initial PER).

[12] As plaintiff correctly points out, see Pl.'s Mot. 17, although the Initial Price Evaluation Report included the four requests for clarification and responses by The Entwistle Company (Entwistle), see AR 1772-74 (Initial PER), the Source Selection Evaluation Board (SSEB) did not document any evaluation or analysis of Entwistle's responses until it prepared its

the government's requests for clarification). The SSEB concluded in both reports that the total evaluated price offered by Entwistle was both reasonable and realistic. See AR 1790 (Entwistle PER); AR 1833 (Entwistle PER Addendum).

The Entwistle Price Evaluation Report included a comparison of the items that Entwistle listed in its Bill of Material--that is, items with an estimated cost of $500 or more--with the historical prices of these items and prices culled from market research. AR 1786 (Entwistle PER). Entwistle's [* * *] was the water tank, which Entwistle planned to purchase from its proposed subcontractor, [* * *], at a cost of $[* * *]. Id. The historical price for the water tank, which was derived from previous procurements with Mil-Mar, was $[* * *]. See id.; cf. supra note 6 (discussing the sole-source contracts awarded to Mil-Mar for the production of Hippos). However, because Mil-Mar had purchased the water tank as a framed unit and because Entwistle planned to purchase the water tank and manufacture the frame, the SSEB considered impossible "an 'apples to apples' comparison between [the historical price of] the [water] tank/frame and the [water] tank that Entwistle is offering." AR 1787 (Entwistle PER); cf. id. at 1785 (stating that "Entwistle's total proposed unit price for the HIPPO [* * *] is less than the historical negotiated price for [Mil-Mar's] tank/frame").

Because Entwistle's water "tank price was so much lower than [the historical price]," and in an attempt to "mitigate[] some of the risk inherent with using a new source," the SSEB sought to verify the price of the water tank that Entwistle proposed to purchase from [* * *]. Id. at 1786. Although the SSEB did find an [* * *] water tank truck (priced at $[* * *]) on the price list of the General Services Administration (GSA) online database system, id.; see also AR 1815-17 (GSA price list guide); AR 1818-31 (GSA price list for [* * *]), it could not find a "stand alone" [* * *] water tank, AR 1786 (Entwistle PER) (internal quotation marks omitted). The SSEB therefore "contacted [* * *] and asked if it [sold] the water tank on a stand-alone basis and at what price." Id. [* * *] responded that the price for a stand-alone water tank "would be 'around $[* * *].'" Id. The SSEB found that "[t]his research pricing substantiates the validity of the [price of the water] tank Entwistle proposed," id., and concluded that Entwistle's "proposed price for the water tank certainly appear[ed] reasonable," id. at 1787; see also id. at 1786 (stating that "[t]he tank price is further supported by the [* * *] GSA price list for the entire vehicle with tank and pumping system").

The SSEB also observed that "Entwistle did not comply with Section L.6 instructions to offerors, in its entirety." Id. at 1785. Specifically, Entwistle "did not provide all of the requested information in Attachment []16 under the [Bill of Material]." Id. For example, Entwistle failed to include the part numbers for the items listed in its

---

August 15, 2012 Addendum to the Price Evaluation Report, see AR 1832 (Addendum to the Entwistle Price Evaluation Report).

Bill of Material. Id. at 1786; cf. Compl. ¶ 69 (listing the information that Entwistle failed to include in its Bill of Material); infra Part III.C (discussing Entwistle's failure to include the cost of the frame in the Bill of Material). The SSEB concluded, however, that "the data that was omitted was not significantly material to reject [Entwistle's] proposal." AR 1785 (Entwistle PER); cf. AR 276 (RFP) (providing that an offeror's proposal may be rejected if "[t]he proposal fails to meaningfully respond to the instructions in Section L of this solicitation" such as by "fail[ing] to provide any of the data and information required in Section L").

In the Addendum to the Price Evaluation Report, the SSEB examined Entwistle's responses to the government's requests for clarification. AR 1832 (Entwistle PER Addendum); cf. supra Part I.C (discussing the government's requests for clarification). Owing to certain errors in Entwistle's Price Volume not at issue here, the SSEB found that "Entwistle ha[d] understated [its] direct costs by a total of $[* * *]" and adjusted Entwistle's price accordingly. See AR 1833 (Entwistle PER Addendum). The SSEB found this amount to be to be "negligible," however, given that it was "only [* * *]% of the total proposed price" and could likely "be 'negotiated' downward between [Entwistle] and [* * *]." Id. at 1833-34. Notably, the SSEB did not adjust Entwistle's price as a result of the exchange between Entwistle and the government regarding Entwistle's estimated cost to manufacture the Hippo frame. Cf. id. at 1833 (noting that, in response to the government's second request for clarification, Entwistle stated that its estimated material cost for the frame was "$[* * *] and the estimated labor for fabricating the frame is [* * *] hours").

3.     The Final Price Evaluation Report

On August 23, 2012 the SSEB prepared a report titled "Final Price Evaluation Report," AR 1835 (Final PER) (capitalization omitted), the purpose of which was "to determine if the offers [were] reasonable and realistic," id. at 1837. The Final Price Evaluation Report included much of the same information that was provided in the Initial Price Evaluation Report. Compare id. at 1835-43 with AR 1765-74 (Initial PER). Both reports, for example, indicated that Entwistle's water tank price had been "verified via telephone with the tank vendor." See AR 1839 (Final PER); AR 1768 (Initial PER). The Final Price Evaluation Report, however, added that Entwistle's water tank price had also been verified, pursuant to requests for clarification, "via vendor quotation." AR 1839 (Final PER). As it did in the Initial Price Evaluation Report, see AR 1768 (Initial PER), the SSEB concluded in the Final Price Evaluation Report that it "ha[d] no basis to question the reasonableness of the total price offered by Entwistle," AR 1839 (Final PER).

E.     Best Value Analysis and Contract Award

On September 28, 2012 the SSA prepared a thirty-one-page Source Selection Decision Document (SSDD) in which he concluded that, because "the proposal from [Entwistle] represents the best value to the Government," award should be made to Entwistle. AR 1878, 1908 (SSDD). In reaching this conclusion, the SSA reviewed and adopted the ratings the SSEB assigned each offeror under the Production Capability and Experience factors. See AR 1878-79; cf. supra Part I.B (discussing the ratings assigned by the SSEB). The SSA also compared the proposals submitted by the offerors "utilizing a 'trade-off' process, giving appropriate consideration to the evaluation criteria set forth in the RFP and their relative importance." AR 1878 (SSDD); see id. at 1880-1904 (comparing Entwistle's proposal against each of the other offerors' proposals). The court addresses the SSA's best value trade-off analysis in more detail in Part III.E below.

The SSA also stated that, because Entwistle's price was "significantly lower" than that of the next lowest offeror, the contracting officer had "employed cost analysis techniques to determine whether it [was] reasonable to conclude that Entwistle [could] perform the requirements of the contract based on its offered price." Id. at 1906; cf. AR 276 (RFP) (providing that the government may reject a proposal that "contains any unexplained significant inconsistency between the proposed effort and cost and/or price, which implies the offeror . . . has an inherent misunderstanding of the scope of work, or . . . has an inability to perform the resultant contract"). The cost analysis techniques included "a comparison of cost elements, and a review of Entwistle's labor hours and material type(s) to determine risk of successful performance at the offered price." AR 1906 (SSDD). The SSA reviewed the contracting officer's "assessment of price fair[ness] and reasonableness to assure that awarding the contract at Entwistle's proposed price [was] prudent," id. at 1905, and concluded that Entwistle's "total proposed price [of $67,960,541] [did] not appear to be unreasonably low," id. at 1908. The court addresses the SSA's cost analysis in more detail in Part III.D below.

F.      Procedural History

Mil-Mar learned that it was not selected for award on September 28, 2012. AR 2439 (Government Accountability Office (GAO) Protest). Plaintiff filed a protest with the GAO on October 9, 2012, see id. at 2435, and, on January 17, 2013, GAO denied Mil-Mar's protest, AR 2637-38 (GAO Decision). On February 20, 2013, Mil-Mar filed its Complaint with this court. See generally Compl. (filed February 20, 2013).

II.     Legal Standards

A.      Jurisdiction

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, codified in relevant part at 28 U.S.C. § 1491(b)(1) (2006), affords the United States Court of Federal Claims

jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement[,] . . . [regardless of] whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). A plaintiff therefore does not have standing to bring a protest action in this court unless it is an "interested party." See id.; [* * *] Containers, Inc. v. United States, 103 Fed. Cl. 471, 479 (2012). Because "standing is a jurisdictional requirement, a protestor's failure to establish standing precludes a ruling on the merits." Sci. Applications Int'l Corp. v. United States (Sci. Applications), 102 Fed. Cl. 644, 650 (2012) (internal quotation marks omitted).

To show that it is an "interested party" within the context of § 1491(b)(1), a plaintiff must "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (defining an "interested party" as an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). To establish that a plaintiff's "direct economic interest" is affected in the post-award bid protest context, a plaintiff "must show it would have been 'a qualified bidder,' i.e., that it had a 'substantial chance' of being awarded the contract." See Microdyne Outsourcing, Inc. v. United States, 72 Fed. Cl. 230, 232 (2006) (quoting Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370-71 (Fed. Cir. 2002)).

B.     Motion for Judgment on the Administrative Record

Motions for judgment on the administrative record are governed by Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC). See RCFC 52.1(c). A motion for judgment upon the administrative record is distinguishable from a motion for summary judgment. See Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005); RCFC 52.1 rules committee notes (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record."). When evaluating cross-motions for judgment on the administrative record, the court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." DMS All-Star Joint Venture v. United States (DMS), 90 Fed. Cl. 653, 661 (2010) (citing Bannum, Inc., 404 F.3d at 1356-57). "The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary

proceeding." CRAssocs., Inc. v. United States, 102 Fed. Cl. 698, 710 (2011) (citing, inter alia, Bannum, Inc., 404 F.3d at 1356), aff'd, 475 F. App'x 341 (Fed. Cir. 2012).

"The standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases." RCFC 52.1 rules committee notes (2006). Here, the standards of review and burdens of proof and persuasion are set by the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2006), as interpreted and applied in binding precedent, see 28 U.S.C. § 1491(b)(4); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004); see also infra Part II.C (describing APA standard).

C.      Standard of Review

"A bid protest proceeds in two steps." Bannum, Inc., 404 F.3d at 1351. The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law. See id. The second step is to determine whether the error was prejudicial. Id.

1.      The Plaintiff Must Establish Error

Under the APA, an agency's decision shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Galen Med. Assocs., Inc. v. United States (Galen), 369 F.3d 1324, 1329 (Fed. Cir. 2004) (applying the APA standard). Under the arbitrary or capricious standard of review, an agency's decision must be sustained if it has a rational basis. See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm), 463 U.S. 29, 43 (1983). "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). In particular, the reviewing court may not substitute its judgment for that of the agency. State Farm, 463 U.S. at 43. The question for the court is not whether the agency is correct or whether the court would have reached the same conclusion as the agency, but whether there was a reasonable basis for the agency's actions. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." (internal quotation marks omitted)).

In the procurement context, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico

Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001). "[T]his standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" CRAssocs. Inc., 102 Fed. Cl. at 710 (second alteration in original) (quoting Balt. Gas & Electric Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)). When a plaintiff challenges a procurement based upon a violation of statutes or regulations, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" Impresa, 238 F.3d at 1333 (quoting Kentron Haw., Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

When a plaintiff challenges a procurement based upon a claim that a procurement official's decision is irrational, the court must determine whether the procuring agency "provided a coherent and reasonable explanation of its exercise of discretion." Id. at 1332-33 (internal quotation marks omitted). This entails an examination of whether the procuring agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or reached a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc.-Birmingham v. United States (Ala. Aircraft), 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting State Farm, 463 U.S. at 43). The scope of review under this standard is narrow and the court "should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." Baird Corp. v. United States, 1 Cl. Ct. 662, 664 (1983).

"The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals." One Largo Metro, LLC v. United States (One Largo), 109 Fed. Cl. 39, 74 (2013). The discretion afforded to contracting officers is greater in negotiated procurements, as compared to sealed bid procurements, and the protester has an even "heavier burden of proof." L-3 Commc'ns EOTech, Inc. v. United States (L-3 Commc'ns I), 83 Fed. Cl. 643, 650 (2008), appeal dismissed by stipulation, 356 F. App'x 390 (Fed. Cir. 2009); cf. AR 71 (RFP) (indicating that the Solicitation used "Negotiated" as opposed to "Sealed" bidding). A plaintiff's burden is further "elevated where the solicitation contemplates award on a best value basis." Brooks Range Contract Servs., Inc. v. United States (Brooks Range), 101 Fed. Cl. 699, 707 (2011) (internal quotation marks omitted); cf. AR 276 (RFP) (indicating that the Solicitation contemplated award on a best value basis). "Thus, the protestor's burden is especially heavy in negotiated, best value procurements," L-3 Commc'ns I, 83 Fed. Cl. at 650, where a contracting officer is afforded a substantial degree of deference, and, accordingly, "[a]n agency's contract award is . . . least vulnerable to challenge when based upon a best value determination," PlanetSpace Inc. v. United States, 96 Fed. Cl. 119, 125 (2010) (citing Galen, 369 F.3d at 1330).

In determining whether an agency acted rationally, the court is also particularly deferential to the agency's technical evaluation. L-3 Commc'ns EOTech, Inc. v. United States, 87 Fed. Cl. 656, 664 (2009); see E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (stating that "such matters as technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess"). "This is because the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." One Largo, 109 Fed. Cl. at 74 (internal quotation marks and alteration omitted).

### 2. The Plaintiff Must Establish Prejudice

In order to prevail in a bid protest, the plaintiff must demonstrate both that an error occurred and that such error was prejudicial. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see Alfa Laval Separation, Inc. v. United States (Alfa Laval), 175 F.3d 1365, 1367 (Fed. Cir. 1999) ("To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process."). If the court finds that there is no error, there is no prejudice and the government's decisions must be left undisturbed. See Alfa Laval, 175 F.3d at 1367 (stating that to establish prejudice and prevail, a protester must show that it had a substantial chance of receiving the award "but for that error"). Furthermore, "non-prejudicial errors in a bid process do not automatically invalidate a procurement." Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1380 (Fed. Cir. 2009). "In the context of a post-award bid protest, the plaintiff must demonstrate substantial prejudice by showing that there was a substantial chance it would have been awarded the contract but for the agency's error." Brooks Range, 101 Fed. Cl. at 707 (internal quotation marks omitted); see Bannum, Inc., 404 F.3d at 1353 (stating that "[t]o establish 'significant prejudice' [the plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the [alleged] errors" (quoting Info. Tech. & Applications Corp. v. United States (ITAC), 316 F.3d 1312, 1319 (Fed. Cir. 2003) and Alfa Laval, 175 F.3d at 1367)).

## III. Discussion

### A. Plaintiff Has Standing to Bring This Protest

Although the parties do not challenge plaintiff's standing to bring this protest, because "standing is a jurisdictional requirement," Sci. Applications, 102 Fed. Cl. at 650, the court addresses this issue sua sponte, John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1353 (Fed. Cir. 2006) ("Under federal rules any court at any stage in the proceedings may address jurisdictional issues. Thus, even if the issue is not properly raised, this court sua sponte may consider all bases for the trial court's jurisdiction."

(internal quotation marks and alteration omitted)), aff'd, 552 U.S. 130 (2008).[13] For the following reasons, the court finds that Mil-Mar is an interested party--that is, that Mil-Mar is an actual bidder and possesses a direct economic interest in the award of the Solicitation--and therefore has standing to bring this protest. Cf. Rex Serv. Corp., 448 F.3d at 1307 (describing requirements to be an "interested party").

Mil-Mar is an actual bidder that has submitted a proposal in response to the Solicitation, see supra Part I.B, and therefore meets the first prong of the interested party test, cf. Orion Tech., Inc. v. United States, 102 Fed. Cl. 218, 226 (2011) (finding that the first prong was met when there was "no dispute that [the] plaintiff [was] an actual bidder"), aff'd, 704 F.3d 1344 (Fed. Cir. 2013); Chenega Mgmt., LLC. v. United States (Chenega), 96 Fed. Cl. 556, 571 (2010) (finding that the plaintiff was an actual bidder because it had submitted a proposal in response to the solicitation). With respect to the second prong of this test, Mil-Mar has a direct economic interest in the award because Mil-Mar is the incumbent contractor and, in fact, the only contractor ever to have produced Hippos, AR 1767 (Initial PER), and received the highest ratings in both the Production Capability and Experience factors, AR 1879 (SSDD). If the court were to find in plaintiff's favor and the Agency were obligated to reopen the procurement, see Compl. ¶ 139 (requesting, inter alia, that the court order the Agency "to open discussions, request a final proposal revision from all offerors, [and] re-evaluate proposals in accordance with the Solicitation"); Pl.'s Mot. 37-38 (requesting, inter alia, that the court order the Agency to "re-compete the contract"), the court finds that Mil-Mar would have a substantial chance of receiving an award, cf. Impresa, 238 F.3d at 1334 (finding that the plaintiff had standing where, assuming that its protest was successful, the plaintiff had a substantial chance of being awarded the government's re-solicitation of the contract);

---

[13] The court addresses the issue of prejudice twice in bid protest disputes. DynCorp Int'l LLC v. United States, 76 Fed. Cl. 528, 536 n.4 (2007). The court first "weigh[s] prejudice as it pertains to standing, and then more thoroughly weigh[s] prejudice to determine whether a plaintiff shall be afforded relief." Id. "This first showing of prejudice to the protestor, in order to prove standing, must occur before reaching the merits of the bid protest review." Id. (citing Info. Tech. & Applications Corp. v. United States (ITAC), 316 F.3d 1312, 1319 (Fed. Cir. 2003) (stating that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits")). "[T]he prejudice requirement for standing is less stringent than that required for success on the merits." Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 37 (2010), aff'd, 649 F.3d 1320 (Fed. Cir. 2011); see Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 350, 401 (2009) ("A prejudice determination for the purpose of evaluating standing is a limited review that seeks minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing." (internal quotation marks omitted)), modified, 88 Fed. Cl. 466 (2009). These two prejudice requirements have been viewed as "incongruent, although slightly overlapping, standards," Dyonyx, L.P. v. United States, 83 Fed. Cl. 460, 466 n.2 (2008), and the application of the two standards "may yield different results," Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 707 n.15 (2011), aff'd, 691 F.3d 1374 (Fed. Cir. 2012).

Esterhill Boat Serv. Corp. v. United States, 91 Fed. Cl. 483, 486 (2010) ("If the allegations are correct and the Government were obligated to rebid the contracts, [the] plaintiff could win with resubmitted proposals."), appeal dismissed, 452 F. App'x 947 (Fed. Cir. 2010).  The court is satisfied that Mil-Mar is an interested party within the meaning of 28 U.S.C. § 1491(b)(1) and therefore has standing to bring this bid protest action.

> B.      The Agency Treated the Offerors Equally and Rationally in
>          Its Evaluation of Experience

Plaintiff argues that the Agency's evaluation of the offerors' experience lacked a rational basis and violated FAR 1.602-2, see Pl.'s Mot. 6, 15, which requires contracting offers to "[e]nsure that contractors receive impartial, fair, and equitable treatment," FAR 1.602-2 (2012).  Specifically, plaintiff contends the Agency failed to treat offerors fairly and impartially by "consistently and favorably consider[ing] experience submitted by Entwistle that did not include information required by Section L.5.4[] of the RFP, but . . . not extend[ing] the same treatment to the other offerors."  Pl.'s Mot. 6; see also Compl. ¶ 128 ("[T]he Agency repeatedly treated Entwistle more favorably than other offerors and considered its experience, despite the fact it was missing information required by the RFP, but refused to consider . . . missing information required by the RFP when it was offered by another offeror.").  Defendant counters that "[t]he agency's differing evaluations of offerors' experience were rationally based on differences in the offerors' proposals."  Def.'s Mot. 20; see also id. at 18 ("[T]he agency's detailed assessments of offerors' experience were carefully tailored to respond to the varying content of each proposal; differences in evaluations resulted from differences among the proposals.").  Defendant also argues that, even if plaintiff could establish that the Agency treated the offerors unequally and irrationally, plaintiff could not establish prejudice because none of plaintiff's unequal treatment claims actually involves Mil-Mar.  Id. at 29.

As discussed above in Part I.A.1, Section L.5 of the Solicitation addressed the Experience factor, under which offerors were to identify up to five "recent and relevant" contracts that had been performed in the past three years that were "comparable in scope to the requirements of this [Solicitation]."  AR 264-65 (RFP).  Section L.5.4 provided that, for each of the contracts identified, proposals were to include the following information:  the contract numbers and types; contact information for the government or commercial contracting authority, the technical representative of the government or commercial contracting authority and the administrative and procuring contracting officers; copies of the SOW provisions in each contract that demonstrated relevant experience with the five SOW requirements (comparable items, technical manuals, delivery, low temperature requirement and welding); and "[a] discussion of specific similarities between these contract [SOWs] and the [SOW] herein."  Id. at 265.  Section L.5.4 further provided that "[f]ailure to provide the information requested under [Section] L.5.4 . . . so that the Government can verify claimed experience may result in a

determination that your proposal is unacceptable and the elimination of your proposal from consideration for award." Id.

In this section, the court first provides background information regarding the Agency's evaluation of the offerors' experience and then addresses the parties' arguments. For the reasons stated below, the court finds that plaintiff has failed to show that the Agency violated FAR 1.602-2 or otherwise acted without a rational basis, and that, even if plaintiff could make this showing, plaintiff has failed to establish any resulting prejudice.

1.      The Experience of Entwistle, [* * *], [* * *] and [* * *]

Plaintiff claims that the Agency treated Entwistle more favorably than it treated [* * *], [* * *] and [* * *], see Pl.'s Mot. 10-13, all offerors that, according to plaintiff, "claimed experience in a manner similar to Entwistle," see id. at 7. The court now provides a brief summary of the information submitted by each of these offerors to describe its experience.

The Experience Volume submitted by Entwistle consisted of approximately twenty-nine pages and included descriptions of end products, excerpts from purchase descriptions, and SOW provisions for one contract.[14] See AR 1699-1727 (Entwistle's Revised Experience Volume); see also AR 1757-59 (Entwistle's Final Evaluation Report) (summarizing the contracts submitted by Entwistle). The first contract Entwistle identified was a contract for the production of Fuels Operational Readiness Capability Equipment (FORCE) Systems[15] (FORCE contract), and, as supporting material, Entwistle included a description of the program requirements, a list of specifications common to both the FORCE contract and the Solicitation and several pages of excerpts from the FORCE contract's SOW and associated purchase descriptions. See AR 1702-12 (Entwistle's Revised Experience Volume). The second contract Entwistle identified was

---

[14]  The record includes two Experience Volumes submitted by Entwistle, the original Experience Volume dated May 21, 2012, see AR 1628-55 (Entwistle's Original Experience Volume), and a revised Experience Volume dated June 8, 2012, AR 1699-1727 (Entwistle's Revised Experience Volume). As discussed above, see supra Part I.B, Entwistle's Revised Experience Volume was submitted in response to a June 6, 2012 amendment to the Solicitation, which "clarif[ied] certain matters related to projected delivery requirements," AR 1878 (Source Selection Decision Document (SSDD).

[15]  A Fuels Operational Readiness Capability Equipment (FORCE) System is "essentially a Type 3 hydrant fuel delivery system" and "is designed to provide up to 2700 Gallons per Minute . . . of fuel to multiple aircraft." AR 1757 (Entwistle's Final Evaluation Report).

a contract for the production of Tank Cleaning Vacuum Systems[16] (Vacuum contract), and, as supporting material, Entwistle provided a summary of the principal components of the end product and a list of similarities between the Solicitation and the Vacuum contract--using excerpts from the associated purchase descriptions. See id. at 1713-18. The third contract Entwistle identified was a contract for the production of Shipboard Fire Fighting Vehicles[17] (Fire Fighting Vehicle contract) and, as supporting material, Entwistle provided a description of the end product and identified three military standards required by the Fire Fighting Vehicle contract. See id. at 1719-23. The fourth and fifth contracts Entwistle identified were contracts of [* * *], "Entwistle's proposed sub-contractor for the water tank for the HIPPO system," for the production of Potable Water Tank Trucks and, as supporting material, Entwistle provided a description of the end product.[18] See id. at 1724-27.

The Experience Volume submitted by [* * *] consisted of approximately twenty-seven pages and included descriptions of [* * *]'s responsibilities and performance under each contract and also included SOW provisions for two of its contracts. See AR 3473-99 ([* * *]'s Experience Volume); see also AR 4302-03 ([* * *]'s Final Evaluation Report) (summarizing the contracts submitted by [* * *]). For [* * *]'s first contract, a contract for the production of containerized kitchens,[19] [* * *] included a one-page discussion that primarily focused on [* * *]'s quality of performance and ability to foster working relationships with customers, engineers and contracting officers. See AR 3481-82 ([* * *]'s Experience Volume). For [* * *]'s second contract, a contract for the production of Reverse Osmosis Water Purification Units (ROWPU contract), [* * *] included an excerpt from the ROWPU contract's SOW and a brief description of [* * *]'s responsibilities and delivery requirements under the ROWPU contract. See id. at 3482-

---

[16] "The tank cleaning vacuum system is a rugged piece of equipment" that "remove[s] all types of oily water and sludge from bilges, lubricating oil tanks and fuel tanks during cleaning operations, while maintaining a constant suction on bilges." AR 1714 (Entwistle's Revised Experience Volume).

[17] "The Shipboard Fire Fighting Vehicle is a self-propelled, self[-]contained all weather fire fighting vehicle. It is used on aircraft carriers and amphibious assault ships to extinguish a fire or limit the severity of the fire until other systems can be activated." Id. at 1720.

[18] Entwistle also included an excerpt from a military performance specification for one of the [* * *] contracts, see id. at 1726, but the SSEB found the application of this specification to the Solicitation questionable and, "[a]s a result, [Entwistle] was not accorded credit for the specification excerpts, and [was] assessed as having not provided verification of effort for this contract," AR 1760 (Entwistle's Final Evaluation Report).

[19] Containerized kitchens are "complex modified [International Organization for Standardization (ISO)] container system[s]." AR 3481 ([* * *]'s Experience Volume).

83.  For [* * *]'s third contract, a contract for the production of shower facilities and water heaters, [* * *] included a brief description of the product and an excerpt from a "Contractor Performance Assessment Report."  See id. at 3484-85.  For [* * *]'s fourth contract, a contract for the production of shower facilities, [* * *] included a one-paragraph description of [* * *]'s responsibilities and performance under the contract.  See id. at 3485.  Finally, for [* * *]'s fifth contract, a contract for the production of Expeditionary Tricon Systems (Tricon contract),[20] [* * *] included approximately twelve pages from the Tricon contract's SOW, id. at 3487-99, a brief description of the product and a few paragraphs describing [* * *]'s responsibilities and performance under the Tricon contract.  See id. at 3486-87.

        The Experience Volume submitted by [* * *] consisted of approximately eight pages and focused primarily on describing the end product of each contract.  See AR 4241-48 ([* * *]'s Experience Volume); see also AR 4320-22 ([* * *]'s Final Evaluation Report) (summarizing the contracts submitted by [* * *]).[21]  For [* * *]'s first contract, a contract for the production C-5 Isochronal Maintenance Stands,[22] [* * *] provided a brief description of the end product and a brief reference to the welding requirements.  See AR 4242-43 ([* * *]'s Experience Volume).  For [* * *]'s second and third contracts, contracts for the production of 2,000 gallon and 4,000 gallon fuel tanks, [* * *] provided a brief description of the fuel tanks to be produced under each contract and noted that, for both contracts, "[t]he tanks meet ISO requirements for shipping containers."  See id. at 4244, 4246.  For [* * *]'s fourth contract, a contract for the production of Multi-Class DMD Complexes,[23] [* * *] provided a half-page description of the end product and [* * *]'s responsibilities under the contract and also noted that "certified welders were used to perform the . . . stainless steel welding."  See id. at 4245.

---

        [20]  Expeditionary Tricon Systems consist of shipping containers that house a shower, latrine, laundry and a kitchen.  Id. at 3486.

        [21]  The court describes only the four contracts that the SSEB considered in its evaluation of [* * *]'s experience.  See AR 4320-22 ([* * *]'s Final Evaluation Report).  The fifth "contract" that [* * *] identified actually consisted of several contracts, see AR 4247 ([* * *]'s Experience Volume) (listing eight contract numbers), and the SSEB refused to give [* * *] credit for this experience "because the multiple contracts cited result[ed] in more than five contracts being identified in the proposal, exceeding the number allowed per Section L.5.1 of the [RFP]," AR 4322 ([* * *]'s Final Evaluation Report).

        [22]  "C-5 Isochronal Maintenance Stands supply personnel access to the wings, fuselage, and engines of the C-5 aircraft."  AR 4242 ([* * *]'s Experience Volume).

        [23]  Multi-Class DMD Complexes "are used in support of the [United States] Navy nuclear submarine overhaul program."  Id. at 4245 (capitalization omitted).

The Experience Volume submitted by [* * *] consisted of approximately seventeen pages and is considerably less detailed than those of the other offerors. See AR 3698-3714 ([* * *]'s Experience Volume); see also AR 4339-40 ([* * *]'s Final Evaluation Report) (summarizing the contracts submitted by [* * *]).[24] The first contract identified by [* * *] was a contract for the production of trailers and, as support, [* * *] included one sentence that described the welding requirements under the contract and a copy of an ISO certificate awarded to [* * *] for the "[d]esign and manufacture of medium and heavy duty trailers." See AR 3702-04 ([* * *]'s Experience Volume). The second contract identified by [* * *] was a contract awarded to a proposed subcontractor for the production of diesel fuel trucks, and, as support, [* * *] included a few sentences that described the quality of the subcontractor's performance under the contract. See id. at 3709-10. The third contract [* * *] identified was a contract awarded to a proposed subcontractor for the production of technical manuals; as support for this contract, [* * *] included approximately three pages of information about the subcontractor's experience developing technical manuals. See id. at 3711-14.

      2.      The Agency's Evaluation of the Experience of Entwistle, [* * *], [* * *] and [* * *]

A summary of the SSEB's assessment of the risk associated with the prior experience of Entwistle, [* * *], [* * *], and [* * *] is below:

| Offeror | Overall Experience | Comparable Items | Technical Manuals | Delivery | Low Temp Requirement | Welding |
|---|---|---|---|---|---|---|
| Entwistle | Low | Very low | Moderate | Moderate | Low | Moderate |

---

[24] The court describes only the three contracts that the SSEB considered in its evaluation of [* * *]'s experience. See AR 4341 ([* * *]'s Final Evaluation Report). The two "contracts" that the SSEB refused to consider, see id., included a contract awarded to proposed subcontractor Brenner Tank, LLC (Brenner Tank) for the production of stainless steel water tanks (Brenner Tank contract) and purchase orders awarded to Brenner Tank for the production of stainless steel water trailers (Brenner Tank purchase orders), see AR 3705-07 ([* * *]'s Experience Volume). The SSEB did not credit [* * *] with experience under the Brenner Tank contract "because the resultant contract number under which this asserted effort was performed is unknown," AR 4341 ([* * *]'s Final Evaluation Report), and therefore could not be verified, id. at 4346; see AR 1903 (SSDD) (stating that the Brenner Tank contract "was not taken into consideration based on the inability of the evaluators to verify that the solicitation resulted in a contract being awarded to" the prime contractor identified by [* * *]). The SSEB also refused to credit [* * *] with experience under the Brenner Tank purchase orders "because the multiple purchase orders referenced would [have] result[ed] in more than five contracts being identified in the proposal, exceeding the number allowed per Section L.5.1 of the [RFP]." AR 4341 ([* * *]'s Final Evaluation Report); see AR 1903 (SSDD) (stating that, because [* * *] did not provide any supporting information to verify the Brenner Tank purchase orders, "it was impossible for the evaluators . . . to identify the specific experience related to any one of the cited purchase orders so that they could be evaluated without violating the five-contract limit").

| [* * *] | Moderate | Moderate | Low risk | Moderate | High | High |
|---------|----------|----------|----------|----------|------|------|
| [* * *] | High | Moderate | High | High | High | High |
| [* * *] | High | High | High | Moderate | High | High |

See AR 1763-64 (Entwistle's Final Evaluation Report); AR 4307 ([* * *]'s Final Evaluation Report); AR 4326-27 ([* * *]'s Final Evaluation Report); AR 4345 ([* * *]'s Final Evaluation Report); cf. supra note 8 (explaining the Agency's adjectival ratings of the Experience factor). As noted above in Part I.E, the SSA adopted the ratings assigned by the SSEB. See supra Part I.E.

In its evaluation of Entwistle's Experience Volume, the SSEB identified one strength and three weaknesses associated with Entwistle's past experience. AR 1764 (Entwistle's Final Evaluation Report). The SSEB considered as a strength Entwistle's "experience supplying systems that are collectively very comparable to the Hippo, involving essentially the same scope and magnitude of effort and level of complexity as required by this solicitation." Id.; see also AR 1883 (SSDD) (agreeing with the SSEB's "very low risk assessment" for Entwistle "because experience with the major elements of a HIPPO system is a larger risk mitigator than the experience with integration of the elements into a complete system" and stating that "[t]he complexity of the HIPPO lies in the major elements").[25] As a weakness, the SSEB found that although [* * *] had

_____

[25] Plaintiff argues that the Agency's determination that Entwistle has experience manufacturing products that "collectively involve the major elements of sanitary liquid handling and storage systems . . . is arbitrary and capricious." Pl.'s Mot. 13 (internal quotation marks omitted). As support, plaintiff claims that "Entwistle had no welding experience, offered no experience making the ISO frame and relied on" its proposed subcontractor, [* * *], "with 1 month of production quantities of 30 items to establish its delivery experience," while "Entwistle itself had no comparable delivery experience." Id. at 13-14.

As an initial matter, the court agrees with the United States (the government or defendant) that plaintiff's arguments are "inaccurate and unsupported." See Def.'s Mot. 31. First, the record does not support plaintiff's contention that "Entwistle had no welding experience." See infra note 26 (discussing Entwistle's welding experience); cf. Pl.'s Mot. 13. Second, with respect to the [* * *] contract to which plaintiff refers, the SSEB determined that [* * *] had six months of experience delivering twenty to thirty products per month, see AR 1761 (Entwistle's Final Evaluation Report), not one month of delivery experience as plaintiff contends, cf. Pl.'s Mot. 14. Moreover, as defendant correctly notes, even if [* * *] did have only one month of experience delivering thirty items, plaintiff "has failed to explain why it is per se unreasonable for the agency to consider that experience relevant." See Def.'s Mot. 31; cf. AR 72 (RFP) (indicating that the offeror selected for award would be expected to manufacture and deliver up to an estimated thirty-five Hippos a month); AR 1883 (SSDD) (same). Finally, the Solicitation did not require offerors to submit information that suggested they had experience manufacturing ISO frames, see AR 264-65 (RFP) (listing the information that offerors were to submit in support of their recent and relevant experience), so the fact that the Agency did not penalize Entwistle for not providing evidence of this experience is not unreasonable.

experience delivering "sanitary liquid handling and storage system[s] at a rate very close to that required by the solicitation, the end item produced under the contract is . . . only somewhat comparable in scope to the Hippo." AR 1764 (Entwistle's Final Evaluation Report). The SSEB also identified as weaknesses Entwistle's lack of experience in developing technical manuals of the type required by the Solicitation and in welding stainless steel in accordance with the standards required by the Solicitation. Id.

The SSEB identified zero strengths and four weaknesses associated with [* * *]'s past experience. AR 4308 ([* * *]'s Final Evaluation Report). The SSEB found that [* * *]'s "[c]ited experience references comparable items that involve only some of the scope and magnitude of effort and complexities required by this solicitation." Id. The SSEB also found that [* * *] failed to demonstrate experience delivering products "with a complexity comparable to the Hippo at the rate required by the solicitation." Id. The SSEB further found that [* * *] lacked experience in manufacturing products that could meet the low temperature requirement and in welding stainless steel in accordance with the standards required by the Solicitation. Id.

The SSEB identified zero strengths and several weaknesses associated with the past experience of both [* * *] and [* * *]. See AR 4327 ([* * *]'s Final Evaluation Report); AR 4346 ([* * *]'s Final Evaluation Report). The SSEB assigned [* * *] and [* * *] five weaknesses each for failing to provide "verifiable experience" with respect to any of the Solicitation's five SOW requirements. See AR 4327 ([* * *]'s Final

Moreover, the court finds that the Agency acted well within its discretion when it determined that Entwistle "has experience supplying systems that are collectively very comparable to the Hippo," see AR 1764 (Entwistle's Final Evaluation Report), and that plaintiff has failed to meet the heavy burden of proof necessary to show that this determination lacked a rational basis, cf. L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 650 (2008) ("[T]he protestor's burden [of proof] is especially heavy in negotiated, best value procurements."), appeal dismissed by stipulation, 356 F. App'x 390 (Fed. Cir. 2009); Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 384 (2003) (determining that "naked claims" of disagreement with evaluations, "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious"), aff'd, 365 F.3d 1345 (Fed. Cir. 2004). The court defers to the Agency's technical determination that--despite the fact that Entwistle lacked "experience with integration of the [Hippo] elements into a complete system"--one of the strengths of Entwistle's proposal was its collective "experience with the major elements of a HIPPO system." See AR 1883 (SSDD); cf. One Largo Metro, LLC v. United States, 109 Fed. Cl. 39, 74 (2013) ("[T]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." (internal quotation marks omitted)). Absent a finding that "the agency's determinations were irrational or unreasonable," the court will "not substitute its judgment . . . for that of the agency." Baird Corp. v. United States, 1 Cl. Ct. 662, 664 (1983).

Evaluation Report); AR 4346 ([* * *]'s Final Evaluation Report). The SSEB assigned an additional weakness to [* * *] for failing to provide "actual contract SOWs . . . to describe previous experience" and failing to discuss the similarities between its five most recent and relevant contracts and the "current solicitation." AR 4327 ([* * *]'s Final Evaluation Report).

3.     The Agency Treated Offerors Equally and Rationally in Its Evaluation of Experience

Plaintiff argues that the Agency violated FAR 1.602-2 and "[a]bused its discretion by treating the offerors unequally" in its evaluation of experience. See Pl.'s Resp. 8; Pl.'s Mot. 6 (arguing that "[t]he Agency's evaluation of the offerors' proposals violated FAR 1.602-1"), 15 (similar); cf. FAR 1.602-2 (providing that contracting officers must "[e]nsure that contractors receive impartial, fair, and equitable treatment"). According to plaintiff, "the Agency was unable to verify whether Entwistle's claimed experience was actually relevant to the Hippo RFP," given the limited amount of information provided by Entwistle, Pl.'s Mot. 8, and that, unlike its assessment of other offerors, the Agency did not consider Entwistle's failure to verify its experience a weakness, id. at 9. Plaintiff contends that the Agency did not extend the same type of treatment to the other offerors "who claimed experience in a manner similar to Entwistle," id. at 7; see id. at 14 (claiming that other offerors were "assigned negative risk ratings or a weakness when their proposals lacked verifiable information"), and that, "[i]nstead, the Agency consistently disregarded the RFP's requirements when it evaluated Entwistle's proposal, which resulted in Entwistle receiving artificially inflated ratings and ultimately being included in the best value trade-off," id. at 9.

Defendant responds that "the agency had applied precisely the same standard-- whether each offeror had supplied sufficient information to permit verification of claimed experience--to each proposal, and reached different ratings for different offerors only as a result of significant differences between proposals." Def.'s Reply 2 (internal quotation marks and alteration omitted); see Def.'s Mot. 18 (arguing that any "differences in evaluations resulted from differences among the proposals"). According to defendant, "because ascertaining the nature of an offeror's experience--rather than policing strict compliance with every single instruction in the solicitation--was the agency's goal, the agency did not automatically penalize an offeror simply for failing to submit a [SOW]." Def.'s Mot. 23. Defendant claims that the Agency "gave offerors credit for relevant experience that was described with reasonable specificity" regardless of whether it came "in the form of a [SOW] excerpt." Id.; see id. at 21 (stating that "the agency did not penalize any offeror for failing to submit a [SOW] from a given contract so long as the offeror submitted sufficient other information to make clear the nature of the work involved"); accord Intervenor's Mot. 20 (stating that "the Agency did not eliminate any of the [Experience Volumes] from consideration for award because it failed to include

copies of [SOWs], but, rather, the agency evaluated each one in light of and utilizing the information provided").

"[I]t is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 383 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004); cf. Chenega, 96 Fed. Cl. at 585 ("This court has held that unequal treatment claims are the quintessential example of conduct which lacks a rational basis." (internal quotation marks and emphasis omitted)). "Equal treatment, however, does not require that all proposals be treated the same." Chenega, 96 Fed. Cl. at 585 (citing FAR 1.102-2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.")).

Plaintiff's argument that the Agency treated the offerors unequally, see Pl.'s Mot. 12, simply is not supported by the administrative record.[26] First, the administrative

---

[26] Moreover, the court finds that many of plaintiff's claims in support of this argument, see Pl.'s Mot. 10-14; Pl.'s Resp. to Def.'s Mot. for J. upon the Admin. R. (Pl.'s Resp.), Dkt. No. 31, at 5-6, are misleading and based on incomplete portions of the administrative record. To illustrate, the court addresses plaintiff's arguments involving the Agency's evaluation of the welding requirement.

Plaintiff alleges that the Agency assigned [* * *] a high risk rating for welding because "[[* * *]'s] experience did not explicitly address welding to [American Welding Society (AWS) Standard] D18.3./18.3M," and that "the Agency assessed Entwistle as only 'Moderate Risk,' even though 'none of . . . [Entwistle's] referenced experience explicitly addressed welding stainless steel in accordance with AWS D18.3/18.3M.'" Pl.'s Mot. 10 (second alteration in original) (emphasis omitted) (quoting AR 1763 (Entwistle's Final Evaluation Report)). Plaintiff fails to mention, however, that the full extent of [* * *]'s references to welding consisted of unsupported assertions that three of its contracts required "stainless steel welding." See AR 3481-82, 3486 ([* * *]'s Experience Volume); see also AR 1891 (SSDD) (stating that [* * *] received a high risk rating "because it simply mentioned stainless steel welding" without providing any "other scope of work documentation . . . to substantiate the [* * *] proposed experience").

By contrast, Entwistle included actual excerpts of the Scope of Work (SOW)/purchase description from its contract for the production of FORCE Systems (FORCE contract), which specifically addressed the welding requirements of the FORCE contract. See AR 1710 (Entwistle's Revised Experience Volume) ("Piping shall be welded IAW ASME B31.3. All welding procedures and welder[s] employed shall be certified IAW ASME Boiler and Pressure Vessel Code, Section IX. Steel shall be welded IAW AWS D1.1."). Entwistle also included purchase description excerpts from its contract for the production of Tank Cleaning Vacuum Systems (Vacuum contract), which implicated the welding codes associated with the manufacturing standards under the Vacuum contract. See id. at 1716 (stating that the Tank Cleaning Vacuum Systems "are manufactured in accordance [with] A[SM]E-BPVC Section

record does not support plaintiff's assertion that [* * *], [* * *] and [* * *] all "claimed

VIII, Div."). Given this information, the SSEB considered Entwistle's welding experience under both the FORCE contract and the Vacuum contract "somewhat relevant" and rated Entwistle as "moderate risk." See AR 1763 (Entwistle's Final Evaluation Report) (capitalization omitted). Specifically, the SSEB found the FORCE contract "somewhat relevant because it involves the welding of piping to ASME B31.3, . . . welders and welding procedures that are certified to ASME BPVC Section IX[,] [and] . . . requires steel [to] be welded to AWS D1.1." Id. The SSEB also found the Vacuum contract "somewhat relevant because it requires tanks [to] be manufactured in accordance with the ASME BPVC," and, according to the SSEB, "[w]elding to these codes equates to meeting some of the magnitude of effort and complexities required by this solicitation." Id. Given the foregoing, the Agency acted with a rational basis when it rated the welding experience of Entwistle as moderate risk and the welding experience of [* * *] as high risk. Cf. E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (stating that "such matters as technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess"). In the light of the foregoing, the court finds that the Agency did not hold Entwistle to a different standard than [* * *].

Plaintiff also claims that the Agency considered relevant Entwistle's experience welding to the AWS D1.1 standard but that the Agency ignored similar welding experience of [* * *] and [* * *]. See Pl.'s Mot. 12 ("[U]nless you were Entwistle, the Agency was not interested in your ability to weld to AWS D.1.1."). As support, plaintiff claims that the Agency considered Entwistle's FORCE contract "to be somewhat relevant because it required steel to be welded to AWS D1.1," id. at 11, which "is contrary to what the Agency said about [* * *]'s experience welding to AWS D1.1 and D1.2," id. at 12. Plaintiff misconstrues the facts.

As noted above, the Agency found the FORCE contract somewhat relevant because, in addition to requiring steel to be welded to AWS D1.1, it also found that the FORCE contract "involve[d] the welding of piping to ASME B31.3, and welders and welding procedures that are certified to ASME BPVC Section IX." AR 1763 (Entwistle's Final Evaluation Report). Moreover, unlike Entwistle's provision of excerpts from the SOW or purchase description of the FORCE contract, see AR 1710 (Entwistle's Revised Experience Volume), both [* * *] and [* * *] simply asserted, without support, that one of their contracts required welding to the AWS D1.1 standard, see AR 4243 ([* * *]'s Experience Volume) (stating that [* * *]'s contract for C-5 Isochronal Maintenance Stands required "[w]elding per AWS D1.1"); AR 3702 ([* * *]'s Experience Volume) (stating that [* * *]'s contract for the production of trailers "was welded I.A.W. AWS.D1.1"). The Agency did not find the welding experience of either [* * *] or [* * *] relevant because neither provided information that verified its experience. See AR 4326 ([* * *]'s Final Evaluation Report); AR 4344 ([* * *]'s Final Evaluation Report); AR 1884, 1905 (SSDD) (stating that [* * *]'s and [* * *]'s "assertions regarding [welding] experience lacked meaningful credibility where [they] failed to include [SOW] or paraphrased/quoted contract provision extracts in [their] proposal[s]"). Given the foregoing, the court finds that the Agency acted reasonably and well within its discretion when it gave Entwistle a welding experience rating of moderate risk, while rating the welding experiences of both [* * *] and [* * *] as high risk. Cf. E.W. Bliss Co., 77 F.3d at 449. Accordingly, the court finds that the Agency did not hold Entwistle to a different standard than [* * *] or [* * *].

experience in a manner similar to Entwistle." Cf. Pl.'s Mot. 7. In fact, these "offerors supplied the agency with widely varying amounts of information to document their experience." See Def.'s Mot. 25; supra Part III.B.1 (summarizing the information provided by each offeror).

Moreover, plaintiff has failed to establish that the Agency addressed the varying amounts information provided by the offerors in an unfair or irrational manner. When an offeror provided verifiable experience, regardless of whether that included excerpts of SOWs or a discussion of similarities between these relevant SOWs and the Solicitation's SOW, the SSEB credited the offeror with that experience and did so in a fair and rational manner. See, e.g., AR 1760 (Entwistle's Final Evaluation Report) (crediting Entwistle for its inclusion of "purchase description requirements" for the Vacuum contract under the comparable items consideration); AR 4305 ([* * *]'s Final Evaluation Report) (crediting [* * *] for "[a] number of paraphrased system requirements" that [* * *] provided in support of its comparable item experience). Similarly, when an offeror failed to provide verifiable experience, the SSEB downgraded the offeror's ratings fairly and rationally. See, e.g., AR 1760-61 (Entwistle's Final Evaluation Report) (downgrading Entwistle's technical manual rating because of the limited information Entwistle provided regarding the technical manuals supplied under the FORCE contract); AR 4324 ([* * *]'s Final Evaluation Report) (assigning [* * *] a high risk technical manual rating because of [* * *]'s failure to provide supporting documentation); see also supra notes 18 (noting the Agency's refusal to credit Entwistle with experience associated with a military specification because the application of the specification to the Solicitation was considered questionable), 24 (noting the Agency's refusal to credit [* * *] with experience associated with a contract because the award of the contract could not be verified).

Plaintiff has failed to meet the heavy burden required to show that the Agency violated FAR 1.602-2 and treated Entwistle, [* * *], [* * *] and [* * *] unequally in its evaluation of experience. Cf. FAR 1.602-2 (providing that contracting officers must "[e]nsure that contractors receive impartial, fair, and equitable treatment"); L-3 Commc'ns I, 83 Fed. Cl. at 650 ("[T]he protestor's burden [of proof] is especially heavy in negotiated, best value procurements."). To the extent that the Agency "assessed [Entwistle] more favorable risk ratings than other offerors," see Pl.'s Resp. 8, the court finds that the Agency's evaluation of the offerors' experience was rational and reasonable and that the Agency "provided a coherent and reasonable explanation of its exercise of discretion," cf. Impresa, 238 F.3d at 1332-33 (internal quotation marks omitted). As intervenor points out, "[a]ssessing the significance of the differences in each offeror's experience, as reflected in its proposal, is the heart of the proposal evaluation process entrusted to the Agency." See Intervenor's Mot. 22; see also id. at 23 ("The fact that Plaintiff disagrees with the judgment reached by the SSEB in this matter . . . falls far short of meeting Plaintiff's heavy burden to set aside the Agency's technical evaluation in this negotiated, best value procurement."); cf. E.W. Bliss Co., 77 F.3d at 449 (stating

that "such matters as technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess"); One Largo, 109 Fed. Cl. at 74 (stating that "the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations" (alteration and internal quotation marks omitted)).[27]

[27] In its Response, plaintiff appears to argue, in the alternative, that the Solicitation required offerors to provide copies of SOWs and that the "Agency's waiver" of this requirement for "some offerors," that is, Entwistle, [* * *], [* * *] and [* * *]--but not for Mil-Mar--"was arbitrary, capricious and resulted in disparate treatment." Pl.'s Resp. 1; see id. at 1-2 (arguing that a "plain reading of the RFP" suggests that a failure to submit copies of SOWs equates to "a failure to submit sufficient information about prior experience" (internal quotation marks omitted)); cf. Def.'s Reply in Supp. of Its Cross-Mot. for J. upon the Admin. R. (Def.'s Reply), Dkt. No. 34, at 2 (claiming that, after defendant "made [the] showing" that the Agency evenhandedly "assess[ed] the sufficiency of information provided about offerors' experience," plaintiff "shifted its argument[]" and asserted that this approach to evaluating experience was prohibited under the Solicitation). According to plaintiff, "the Agency's use of an evaluation methodology different from what was stated in the RFP benefited Entwistle and prejudiced Mil-Mar," Pl.'s Resp. 7, because Mil-Mar, unlike "most of the competition," submitted a "100% compliant proposal," id. at 6-7.

As plaintiff points out, see Pl.'s Mot. 6, most of the offerors failed to include, for each of the recent and relevant contracts identified, copies of actual SOW provisions, see Part III.B.1 (discussing offerors' prior contract submissions). Under Section L.5.4 of the Solicitation, the Agency could have found these proposals "unacceptable" and eliminated them "from consideration for award." See AR 265 (RFP). However, rather than "eliminat[ing] most of the competition," plaintiff argues that the Agency "tried to evaluate offerors based on some ad hoc and unsubstantiated methodology that was not in accord with the RFP." Pl.'s Resp. 7; see id. at 2 (arguing that the Solicitation does not permit the Agency to rely on "this Government-proffered alternative method of evaluating claimed experience," that is, submission of "sufficient other information about . . . prior experience" (internal quotation marks omitted)).

Defendant counters, and the court agrees, that "the agency's assessment of experience was entirely consistent with the terms of the solicitation." Def.'s Reply 4; see Tr. 60:24-61:5 (Barbara E. Thomas (Ms. Thomas)) ("Nothing in the solicitation required that the agency could only look at [SOWs]. Nothing said that the agency can't look at other types of information about contracts that are submitted, and nothing in the solicitation said the agency must refuse to give credit for experience on a contract for which an offeror didn't submit a [SOW]."). Section L.5.4 of the Solicitation provided that "[f]ailure to provide the information requested under [Section] L.5.4"--which included copies of actual SOW provisions--"so that the Government can verify claimed experience may result in a determination that" the offeror's proposal was unacceptable and, therefore, eliminated "from consideration for award." AR 265 (RFP) (emphasis added); see also id. at 276 (providing that the Agency "may" reject a proposal if the proposal "provides some data but omits significant material data and information required by Section L"). Defendant argues that, "by providing that a proposal 'may' be found unacceptable if it fails to include the

Finally, defendant argues that even if plaintiff could establish that the Agency treated Entwistle more favorably than [* * *], [* * *] and [* * *], plaintiff could not establish prejudice because none of plaintiff's unequal treatment claims actually involve Mil-Mar. Def.'s Mot. 29; see id. at 30 ("Mil-Mar has failed to demonstrate that the absence of the supposedly disparate treatment it describes would have had any effect on its own chances of winning the Hippo contract."); cf. Data Gen. Corp., 78 F.3d at 1562 (stating that, in order to prevail in a bid protest, the plaintiff must demonstrate both that an error occurred and that the error was prejudicial). Defendant contends that plaintiff's "arguments therefore differ drastically from those of protestors who have successfully presented disparate treatment arguments" because, "[i]n those cases, the protestor typically argued that its own proposal had been subject to disparate treatment." Def.'s Mot. 29-30 (citing BayFirst Solutions, LLC v. United States, 102 Fed. Cl. 677, 690-91 (2012) and Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273-74 (2004), modified, 63 Fed. Cl. 141 (2004)).

Plaintiff contends that if the Agency had treated all offerors equally, Entwistle would have received "higher risk ratings for several of the considerations, which would have materially altered the Agency's best value tradeoff," and that "Mil-Mar, with the highest rating and a competitive price, would have had a substantial chance of receiving the award." Pl.'s Mot. 15; see also Pl.'s Resp. 7 ("But for Entwistle's artificially inflated ratings, the Government's trade off would have been between Mil-Mar and other similarly priced offerors and there is a substantial chance Mil-Mar would have been awarded the contract."). Defendant counters that plaintiff fails to consider that, but for

---

information requested, the solicitation contemplates that . . . a proposal may be found acceptable even though it fails to include some requested information." Def.'s Reply 3.

Defendant's argument is further supported by Section M.3.5 of the Solicitation, which provides that the successful offeror's proposal must "meet[] all the material requirements of this solicitation." AR 277 (RFP) (emphasis added). "As that language indicates, the agency expressly anticipated, and the solicitation explained, that even the ultimately successful offeror might not meet every requirement of the solicitation." Def.'s Reply 3; see Tr. 62:17-20 (Ms. Thomas) ("[The solicitation] expressly contemplated that even if an offeror didn't submit all the information that the solicitation said was 'required', that they still might win the award."). Accordingly, the court does not consider the Agency's decision to rely on other information to verify claimed experience as "a failure to follow the terms of its own Solicitation," cf. Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004) ("The agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis."), modified, 63 Fed. Cl. 141 (2004); infra note 33 (noting that although the Solicitation appears to require certain information in one section, it affords the Agency flexibility regarding that information in another).

the alleged disparate treatment, the Agency would have assigned the other offerors lower risk ratings.  See Def.'s Mot. 30.

The court finds that plaintiff's attenuated argument does not support a showing of "substantial prejudice."  Cf. Brooks Range, 101 Fed. Cl. at 707 ("In the context of a post-award bid protest, the plaintiff must demonstrate substantial prejudice by showing that there was a substantial chance it would have been awarded the contract but for the agency's error." (internal quotation marks omitted)).  Plaintiff cites to no authority, and the court is aware of none, that supports plaintiff's argument that a party not subject to the alleged unequal treatment claims can demonstrate prejudice.  See Tr. 46:19-24 (colloquy between the court and Barbara Ann Duncombe (Ms. Duncombe)) (the court: "[D]o you all have any authority . . . in support of a finding of unequal treatment when the Plaintiff was not the subject [of the unequal treatment claims]?"  Ms. Duncombe: "No, Your Honor.").  Although plaintiff may be "looking to make some new case[]law," see Tr. 46:25 (Ms. Duncombe), the court is not similarly inclined.

C.      The Agency Did Not Conduct Improper, Unequal Discussions

Plaintiff argues that the government engaged in exclusive discussions with Entwistle that allowed Entwistle to revise its proposal to make it compliant with the terms of the Solicitation.  See Compl. ¶ 117; Pl.'s Resp. 9.  Specifically, plaintiff contends that two of the government's requests for clarification and Entwistle's responses (the two exchanges) constituted unequal discussions in violation of FAR 15.306.  See Pl.'s Mot. 17-20; cf. supra Part I.C (discussing the content of the two exchanges).  Plaintiff further contends that "[h]ad the Agency not entered into unequal discussions with Entwistle, it would have concluded that it could not adequately evaluate Entwistle's significantly lower price for realism and would have rejected its offer."  Compl. ¶ 117; see Pl.'s Resp. 9 (claiming that the alleged discussions "help[ed] make [Entwistle's] proposal compliant with the RFP's requirements").  Defendant counters that "[t]here is no reasonable basis for concluding that these two exchanges constituted discussions," Def.'s Mot. 33, and that, "[e]ven if the agency's exchanges with Entwistle had constituted discussions, . . . Mil-Mar has not demonstrated that it was prejudiced," id. at 34.  For the following reasons, the court finds that the two exchanges did not constitute discussions and that, therefore, the Agency did not enter into unequal discussions with Entwistle.  The court further finds that, even if the two exchanges had constituted discussions, plaintiff has failed to establish prejudice.

"In negotiated procurements, the procuring agency may engage in a wide range of exchanges with offerors in order to facilitate the evaluation process and to permit the agency to make an informed award decision."  Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 714 (2010) (citing FAR 15.306 and ITAC, 316 F.3d at 1320-23).  "Different exchanges are permitted under different circumstances and at various stages of the procurement process."  Id.  For example, "negotiations" are exchanges "that are

undertaken with the intent of allowing the offeror to revise its proposal," and "discussions" are negotiations that occur "after establishment of the competitive range" in competitive acquisitions. FAR 15.306(d). "The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation." FAR 15.306(d)(2); see ITAC, 316 F.3d at 1322 ("[W]hen discussions are opened, bidders have the opportunity to revise their proposals, in order 'to maximize the Government's ability to obtain best value.'" (quoting FAR 15.306(d)(2))). When an agency decides to hold discussions, they "must be conducted . . . with each offeror within the competitive range." FAR 15.306(d)(1); cf. FAR 15.306(e) (providing that the government "shall not engage in conduct that . . . [f]avors one offeror over another").

Where, as here, see AR 276 (RFP), a solicitation provides "that the Government intends to evaluate proposals and make award without discussions," FAR 15.306(a)(3), an agency may engage offerors in clarifications, see FAR 15.306(a). FAR 15.306(a) defines clarifications as "limited exchanges," FAR 15.306(a)(1), that are intended to give offerors "the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors," FAR 15.306(a)(2).[28] Unlike discussions, which must be conducted equally with all offerors within the competitive range, see FAR 15.306(d)(1), an agency has the discretion to engage in clarifications with just one offeror, DynCorp Int'l LLC v. United States (DynCorp), 76 Fed. Cl. 528, 540 (2007).

Section L.6.6 of the Solicitation provided that "the Government reserves the right, as a clarification under FAR 15.306(a), to request additional or more detailed price breakdown data to support its determination of price reasonableness." AR 266 (RFP). Although it is "[t]he actions of the parties, not the characterization by the agency, [that] determine whether discussions have been held," Allied Tech. Grp., Inc. v. United States (Allied Tech.), 94 Fed. Cl. 16, 44 (2010), aff'd, 649 F.3d 1320 (Fed. Cir. 2011), the agency's characterization of an exchange as a clarification is entitled to deference from the court, G4S Tech. CW LLC v. United States (G4S), 109 Fed. Cl. 708, No. 12-705C,

---

[28] The court notes that, in 1997, "the definition of 'clarifications' was significantly broadened" by amendment to the Federal Acquisition Regulations (FAR). ITAC, 316 F.3d at 1321-22 (comparing FAR 15.601 (1991) with FAR 15.306(a)(2) (2002)); see also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 715 (2010) (noting that "the 1997 amendments to the FAR were intended to broaden significantly the definition of 'clarifications'"). "The stated purpose of the 1997 amendments to section 15 of the regulations was to 'provide for empowerment and flexibility' and 'shift from rigid rules to guiding principles.'" ITAC, 316 F.3d at 1321 (quoting Federal Acquisition Circular 97-02, 62 Fed. Reg. 51,244, 51,225 (Sept. 30, 1997)). "Specifically, the new regulations were intended to support more open exchanges between the Government and industry." Id. (alterations and internal quotation marks omitted).

2013 WL 935890, at *12 (Fed. Cl. Mar. 12, 2013) (citing ITAC, 316 F.3d at 1323). "Thus, this court must give deference to an agency's view that an [exchange] was a clarification, as long as that interpretation was permissible and reasonable." Dyncorp, 76 Fed. Cl. at 542 (internal quotation marks omitted); see ITAC, 316 F.3d at 1323 (stating that the United States Court of Appeals for the Federal Circuit (Federal Circuit) "recently emphasized that the [federal] acquisition regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations" (alteration and internal quotation marks omitted)).

The two exchanges that plaintiff challenges took the form of limited e-mail correspondence between the agency and Entwistle. See supra Part I.C (describing the two exchanges). Each of the government's requests for clarification included the following disclaimer: "[N]either this communication nor your submission of requested clarification information in response to this communication will constitute discussions as described in FAR 15.306(d) . . . . Be advised that this clarification request does not allow you to modify your proposal, including your proposed prices, in any way." AR 1848, 1853 (two requests for clarification). In the first request, the Agency asked Entwistle to "clarify the cost (material and labor) associated with fabricating the ISO frame." AR 1773 (Initial PER). Entwistle responded as follows: "The estimated material cost for the frame is $[* * *]. The estimated labor for fabricating the frame is [* * *] hours." Id. In the second request, the Agency asked Entwistle to "clarify how [its] proposed labor hours are adequate to carry out the steps necessary for production of the First Article Test items and production quantities." Id. Entwistle responded as follows: "The production labor hours were estimated for each labor category based on our understanding of the solicitation requirements. Based on our experience with design programs, a factor was applied to the production hours to arrive at the first article labor hours." Id. at 1774.

Plaintiff argues that these two exchanges amounted to discussions because the Agency "gave Entwistle an opportunity to revise its proposal by asking it to provide material information that was required, but omitted, from Entwistle's proposal, and that was critical to the Agency's ability to evaluate the realism of Entwistle's price." [29] Pl.'s Mot. 18 (emphasis omitted); see also Tr. 11:21-23 (Ms. Duncombe) (conceding that the first exchange "gave Entwistle the opportunity to basically cure a proposal deficiency with material information that it had omitted"); Pl.'s Mot. 20 (arguing that, in the second exchange, Entwistle made "its proposal more appealing to the Agency by submitting

_____

[29] Plaintiff also contends that, by allowing Entwistle to provide information regarding the cost and labor associated with the ISO frame, "the Agency gave Entwistle the opportunity to cure a material omission in violation of FAR [] 15.306(b)(2)." Pl.'s Mot. 19. However, as defendant correctly points out, see Def.'s Mot. 32, FAR 15.306(b) concerns communications, a type of exchange not at issue here, cf. FAR 15.306(b) (2012) (defining "communications" as "exchanges, between the Government and offerors, after receipt of proposals, leading to the establishment of the competitive range").

information that the Agency thought was necessary for its analysis of Entwistle's proposed price"). Plaintiff also contends that neither exchange is governed by Section L.6.6 of the Solicitation because "the Agency requested Entwistle [to] provide key pricing information not present in its proposal--not additional information or more details." See Compl. ¶ 78; see Tr. 13:11-14 (Ms. Duncombe) (conceding that "any time the government issues a question to an offeror, . . . it's going to be asking for additional information"); cf. AR 266 (RFP) (providing in Section L.6.6 that "the Government reserves the right, as a clarification under FAR 15.306(a), to request additional or more detailed price breakdown data to support its determination of price reasonableness"). Defendant responds that plaintiff's argument "is predicated upon the incorrect assertion that the information provided by Entwistle to the agency during these two exchanges was required by the solicitation." Def.'s Reply 6; cf. Allied Tech., 94 Fed. Cl. at 45 (determining that an exchange was a clarification partly because "nothing in the Solicitation expressly required" the information requested by the Agency).

The court finds that the information provided by Entwistle in the first exchange--the estimated material cost and labor hours for fabricating the ISO frame--was required by the Solicitation, but that the information provided by Entwistle in the second exchange--an explanation of how its proposed labor hours were estimated--was not. With respect to the first exchange, Section L.6 of the Solicitation required offerors to identify all parts with an estimated cost of $500 or more in their Bill of Material and also to provide their proposed direct labor hours. AR 265-66 (RFP) (stating that offerors "shall" provide this information in Attachment 16); see supra Part I.A.1 (discussing Attachment 16). The record suggests that Entwistle failed to include the cost of the ISO frame in its proposal despite this requirement.[30] See AR 1656-60 (Entwistle's Attachment 16) (listing no identifiable costs associated with the frame); AR 1785 (Entwistle PER) (observing that Entwistle "did not provide all of the requested information in [the Bill of Material in] Attachment []16"). The record is less clear as to whether Entwistle included in Attachment 16 the [* * *] labor hours it estimated it would take to manufacture an ISO frame. In response to the third request for clarification regarding direct labor hours, which plaintiff does not dispute, see Pl.'s Mot. 18-20 (disputing only the second and fourth requests for clarification), Entwistle provided a corrected Attachment 16, in which Entwistle estimates [* * *] hours of machining and [* * *] hours of welding, see AR 1777 (corrected Attachment 16); AR 1833 (Entwistle

---

[30] Entwistle estimated that the material cost of the ISO frame was $[* * *], AR 1773 (Initial PER), and the court considers it unlikely that none of the parts Entwistle intended to use to manufacture the frame cost more than $500, cf. AR 266 (RFP) (requiring offerors to "enter all parts with the extended cost per system of $500 or higher in the [Bill of Material]"); Def.'s Reply 6 (arguing that "although the solicitation did ask offerors to specify the cost of parts with an extended value of more than $500, Mil-Mar has not shown that any of the parts Entwistle intended to use to build its frame had an extended value of more than $500" (internal citation omitted)).

PER Addendum) (discussing Entwistle's corrected Attachment 16).  The Agency appears to have viewed the summation of these two categories of work as constituting the [* * *] labor hours estimated by Entwistle to manufacture the frame.  See AR 1868 (Aug. 29, 2012 e-mail from Agency engineer Catherine Thomas to contracting officer Yvette Thompson (August 29, 2012 e-mail or Aug. 29, 2012 e-mail)) (stating that, based on her "review of [an] ISO frame on a completed Hippo from [Agency] inventory," she could not "conclude that an offeror, with [* * *] hours of machining and [* * *] hours of welding, [would] not be able to successfully perform and meet the solicitation requirements"); infra Part III.D.2 (discussing the August 29, 2012 e-mail).  The court does not consider this view unreasonable.

With respect to the second exchange, the court agrees with defendant that nothing in the Solicitation required offerors to describe "how offerors estimated their labor hours."  See Def.'s Reply 6; cf. AR 265 (requiring offerors only to provide "the total proposed direct labor hours and direct labor hours broken down by proposed labor category").

To the extent that Entwistle provided required information that was missing from its proposal through the two exchanges, plaintiff asserts that such information was material information that was necessary for the Agency to evaluate Entwistle's proposal.  See Pl.'s Mot. 18; Tr. 14:7-8 (Ms. Duncombe) (arguing that the Agency sought "material information that was missing from [Entwistle's] proposal").  As to the information provided in the first exchange, plaintiff contends that the "ISO frame is one of the two most important and expensive parts of the Hippo," and that without the cost of the frame, the Agency "could not evaluate the realism of Entwistle's price."  Pl.'s Mot. 19.  Indeed, the SSEB considered the frame a "major item" and reviewed the offerors' cost of the frame in the Initial Price Evaluation Report for the purpose of "test[ing] price realism." AR 1768 (Initial PER).  However, the SSEB also found the information that Entwistle omitted from its Attachment 16, which included the material costs of the frame over $500 and possibly the number of labor hours necessary to manufacture the frame, "was not significantly material to reject [Entwistle's] proposal." [31]  AR 1785 (Entwistle PER); cf.

_____

[31]  When questioned by the court about the SSEB's finding during oral argument, counsel for plaintiff suggested that "the agency was blinded by the low price, and they really wanted to find a way to make sure [Entwistle's] really substantially lower price proposal could be awarded the contract."  Tr. 17:15-19 (Ms. Duncombe); see id. at 17:19-22 (arguing that the Agency attempted to "justify [Entwistle's] lower price" "throughout this whole evaluation").

Defendant argues, and the court agrees, that to the extent plaintiff claims that the Agency carried out the evaluation in bad faith--"that the agency somehow engaged in a conspiracy to elevate the . . . ratings of Entwistle's proposal so that it could take advantage of this low price" or "that it was engineering [the evaluation] in some way to produce a result that wasn't justified by the actual content[] of the proposal[]," Tr. 65:7-14 (Ms. Thomas)--plaintiff has failed to rebut with "well-nigh irrefragable proof" the presumption that "government officials discharge their

AR 277 (RFP) (stating that the contract awardee must meet "all the material requirements of [the] solicitation" (emphasis added)). Determining whether a requirement of the Solicitation is considered a material requirement is a matter within the Agency's discretion. See Allied Tech., 94 Fed. Cl. at 40 ("[T]he Court only will overturn an agency's determination that an offeror's proposal failed to satisfy the material requirements of the solicitation if such a finding was arbitrary and capricious."). And plaintiff has failed to meet the heavy burden necessary to show that the Agency abused its discretion by finding that the cost of the ISO frame--including materials and possibly labor hours--was not a material requirement.[32] See AR 1785 (Entwistle PER); cf. L-3 Commc'ns I, 83 Fed. Cl. at 650 ("[T]he protestor's burden is especially heavy in negotiated, best value procurements."). The court finds that the Agency's decision had a rational basis and the court will not substitute its judgment for the Agency's. Cf. Honeywell, Inc., 870 F.2d at 648 ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." (internal quotation marks omitted)); Baird Corp., 1 Cl. Ct. at 664 (stating that, under the APA standard of review, the court "should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable").

As to the information provided in the second exchange, the court finds that plaintiff has failed to make any showing that Entwistle's description of how its proposed labor hours were estimated, see AR 1774 (Initial PER), was material information that was essential for the Agency to evaluate Entwistle's proposal.

---

duties, correctly, lawfully, and in good faith," John Massman Contracting Co. v. United States, 23 Cl. Ct. 24, 33 (1991) (internal quotation marks omitted); see also Schism v. United States, 316 F.3d 1259, 1302 (Fed. Cir. 2002) (en banc) (stating that government officials are presumed to "perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations . . . and [that this presumption] is valid and binding unless well-nigh irrefragable proof rebuts or overcomes it" (internal quotation marks and citation omitted)).

[32] The court observes that the Independent Government Cost Estimate (IGCE) indicated that manufacturing an entire Hippo unit would cost $[* * *], see AR 1871 (IGCE), and that manufacturing the ISO frame would cost $[* * *] in materials, id. at 1872, and approximately $[* * *] in labor, see id. at 1874 (stating that "[l]abor hours were increased . . . due to fabrication process of ISO frame . . . by [* * *] hours for welder, [* * *] hours for production supervisor, [* * *] hours for quality, and [* * *] hours for material handler); id. at 1874-75 (providing hourly rates of $[* * *] for welding, $[* * *] for production supervision, $[* * *] for quality control inspection and $[* * *] for material handling). The fact that the IGCE suggested that the total cost of the ISO frame--including materials and labor--should be some $[* * *], or approximately [* * *] % of the estimated total cost of manufacturing an entire Hippo unit, supports a finding that the Agency's determination that the omitted cost of the ISO frame was not material had a rational basis.

Even if the court were to find that, through the two exchanges, Entwistle provided the Agency with information that was essential for the Agency to evaluate Entwistle's proposal, the Federal Circuit has found that "[t]here is no requirement in [FAR 15.306(a)] that a clarification not be essential for evaluation of the proposal." ITAC, 316 F.3d at 1323; see id. (rejecting the appellant's contention that "a clarification cannot call for new information if the information is necessary to evaluate the proposal" (internal quotation marks omitted)). Although plaintiff argues that the facts here are distinguishable from those before the Federal Circuit in ITAC, see Tr. 15:23-16:23 (Ms. Duncombe); Pl.'s Resp. 8-9, the Federal Circuit's reading of FAR 15.306(a) is not fact-dependent. Thus, an exchange can constitute a clarification, and not a discussion, even where the information provided was "essential to evaluation criteria, increase[d] a past performance score or tip[ped] the scales toward the offeror providing the clarification." DynCorp, 76 Fed. Cl. at 542 (citing ITAC, 316 F.3d at 1323). This is in line with the Federal Circuit's caution against "cramped conception[s] of 'clarification[s],'" which are "not in harmony with the stated purpose of the 1997 amendments [to the FAR], . . . to '[s]upport[] more open exchanges between the Government and industry.'" ITAC, 316 F.3d at 1323 (some alterations in original) (quoting Federal Acquisition Circular 97-02, 62 Fed. Reg. 51,224, 51,224 (Sept. 30, 1997)); cf. supra note 28 (discussing the 1997 amendments to the FAR).

Moreover, as defendant correctly notes, see Def.'s Mot. 33, the Agency neither sought nor received revisions to the terms of Entwistle's proposal, cf. ITAC, 316 F.3d at 1322-23 (finding that, partly because the government did not give the offeror "the opportunity to revise its proposal, and [the offeror] did not change the terms of its proposal to make it more appealing to the government," the exchanges in question "did not constitute discussions"); G4S, 2013 WL 935890, at *12 (finding that exchanges were clarifications partly because the record did not "suggest that any negotiations took place" or, "[m]ore importantly, . . . that [the offeror] was given the opportunity to revise its proposal"); Allied Tech., 94 Fed. Cl. at 45 (finding that exchanges were clarifications partly because the offeror "provided no revisions or changes to its pricing in light of the [agency's] inquiry"); DynCorp, 76 Fed. Cl. at 544 (same); SecureNet Co. v. United States, 72 Fed. Cl. 800, 815 (2006) (same). Indeed, the record does not suggest that the two exchanges at issue here were "undertaken with the intent of allowing [Entwistle] to revise its proposal." See AR 1848, 1853 (two requests for clarification) (stating that clarifications are "necessary to support the Government's assessment of the reasonableness of your proposed price" and advising that the clarification requests do "not allow you to modify your proposal, including your proposed prices, in any way"); cf. FAR 15.306(d) (defining "negotiations" as exchanges "that are undertaken with the intent of allowing the offeror to revise its proposal" and defining "discussions" as negotiations that occur "after the establishment of the competitive range" in competitive acquisitions).

Nor does the court find that Entwistle revised its proposal as result of the two exchanges. As to the first exchange, although Entwistle may have provided the Agency with required information that was not included in its proposal, the court does not find that Entwistle revised its proposal because Entwistle did not change its total price and did not "change the terms of its proposal to make it more appealing to the government." Cf. ITAC, 316 F.3d at 1322; id. (stating that the FAR "contemplates discussions as occurring the context of negotiations"). And, as to the second exchange, the court finds unpersuasive plaintiff's conclusory statement that "the Agency gave Entwistle an opportunity to materially revise and update its proposal in narrative form," see Pl.'s Mot. 20, when the additional information provided by Entwistle neither changed its total price nor changed "the terms of its proposal to make it more appealing to the government," cf. ITAC, 316 F.3d at 1322.

Given the foregoing, the court finds reasonable the Agency's interpretation of the two exchanges as clarifications, see AR 1848, 1853 (two requests for clarification) (characterizing the requests as clarifications), and therefore defers to the Agency's view that the two exchanges were clarifications, cf. DynCorp, 76 Fed. Cl. at 542 ("[T]his court must give deference to an agency's view that an [exchange] was a clarification, as long as that interpretation was permissible and reasonable." (internal quotation marks omitted)).

Finally, defendant argues that "[e]ven if the agency's exchanges with Entwistle had constituted discussions, . . . Mil-Mar has not demonstrated that it was prejudiced." Def.'s Mot. 34; see id. (arguing that plaintiff has "made no effort to show--and indeed, cannot show--that the information obtained from Entwistle during the exchanges in question had any significant effect on the probability that the agency would award the Hippo contract to Entwistle"). Plaintiff counters that the alleged discussions "help[ed] make [Entwistle's] proposal compliant with the RFP's requirements," Pl.'s Resp. 9, and argues that "[h]ad the Agency not entered into unequal discussions with Entwistle, it would have concluded that it could not adequately evaluate Entwistle's significantly lower price for realism and would have rejected its offer," Compl. ¶ 117; see Tr. 14:6-8, :16-17 (Ms. Duncombe) (arguing that the Agency sought "material information that was missing from the proposal" and that, "without this information[,] [Entwistle's] proposal would have had to be found unacceptable").

The court disagrees with plaintiff's reading of the Solicitation and finds, notwithstanding plaintiff's assertions to the contrary, that the two exchanges did not provide Entwistle with "an opportunity to take an otherwise unacceptable proposal and make it acceptable." Cf. Pl.'s Resp. 9 n.3. Section L of the Solicitation did require certain information--including itemized material costs estimated at over $500 per part and proposed direct labor hours--to be included in Attachment 16 of an offeror's Price Volume. See AR 265-66 (RFP) (stating that offerors "shall" provide this information in Attachment 16); supra Part I.A.1 (discussing Attachment 16). However, the Solicitation afforded the Agency several opportunities to exercise its discretion in accepting proposals

that did not include required information.[33]  For example, the Solicitation provided that the Agency "may" reject proposals that "fail[] to provide any of the data and information required in Section L" or  "omit[] significant material data and information required by Section L." AR 276 (RFP).  And, although the Solicitation stated that the Agency would award a contract only to an offeror that submitted a proposal that "[met] all the material requirements of [the] solicitation," id. at 277, the Agency determined that the omitted requirements were not material, see AR 1785 (Entwistle PER) (stating that the information that Entwistle omitted from its Attachment 16 "was not significantly material to reject [Entwistle's] proposal"), and the court defers to the Agency's discretion in making that determination, cf. Allied Tech., 94 Fed. Cl. at 40 ("[T]he Court only will overturn an agency's determination that an offeror's proposal failed to satisfy the material requirements of the solicitation if such a finding was arbitrary and capricious.").  Moreover, as to plaintiff's argument that, but for the improper discussions, the Agency would have rejected Entwistle's proposal because "it could not adequately evaluate Entwistle's significantly lower price for realism," Compl. ¶ 117, the Solicitation also provided that the Agency "may reject a proposal which is not realistic . . . as to price"; the Solicitaiton did not state that the Agency was required to do so, AR 278 (RFP); see also id. at 276 (stating that the government "may" reject a proposal that "is unrealistically . . . low in price"); cf. infra Part III.D (discussing the Agency's price realism analysis).[34]  Given the foregoing, the court finds that plaintiff has failed to show that, but for the alleged improper discussions, plaintiff had "a substantial chance it would have been awarded the contract," and that, therefore, plaintiff has failed to show substantial prejudice.  Cf. Brooks Range, 101 Fed. Cl. at 707 (internal quotation marks omitted).

D.     The Agency's Price Realism Analysis Was Rationally Based

[33]   The court observes that the drafting of the Solicitation helped to create this protest because, where the Solicitation appears to require certain information in one section, it affords the Agency flexibility in another.  If plaintiff considered the terms of the Solicitation an issue, plaintiff should have objected to the terms prior to the close of bidding.  Blue & Gold Fleet, L.P. v. United States (Blue & Gold), 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the [United States] Court of Federal Claims.").

[34]   Moreover, plaintiff fails to account for the possibility that, had the Agency engaged in discussions with Entwistle, it could have satisfied FAR 15.306(d)(1) by opening up discussions with all of the offerors.  Cf. FAR 15.306(d)(1) (providing that when the government decides to hold discussions, they "must be conducted . . . with each offeror within the competitive range").  Plaintiff does not suggest that its own proposal would have changed if the Agency had held discussions with all of the offerors.  Cf. SecureNet Co. v. United States, 72 Fed. Cl. 800, 815 n.23 (2006) (noting, in concluding that communications did not amount to discussions, that the plaintiff did "not offer any reason to believe its own proposal would have changed if comparative questions" were asked of the plaintiff).

Although the FAR requires contracting officers to evaluate the reasonableness of offerors' proposed prices to ensure that the prices are fair and reasonable,[35] FAR 15.404-1(a)(1), "the FAR does not mandate that either a 'cost realism analysis' or 'price realism analysis' be performed," Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 101 (2006) (emphasis omitted), reconsidered in part on other grounds, 75 Fed. Cl. 406 (2007); see First Enter. v. United States, 61 Fed. Cl. 109, 123 (2004) (stating that although the FAR requires "the contracting officer to do a price reasonableness analysis, there is no similar requirement to do a cost realism analysis"). Pursuant to the FAR, agencies perform cost realism analyses "to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." FAR 15.404-1(d)(1).

Where, as here, an Agency contemplates a fixed-price contract, Compl. ¶ 28, "the 'realism' of offerors' proposed prices would not ordinarily be considered[] because the fixed-price [contract] puts the risk of underpriced offers on the contractor," Afghan Am. Army Servs. Corp. v. United States (Afghan Am.), 90 Fed. Cl. 341, 356 (2009); see Ceres Envtl. Servs., Inc. v. United States (Ceres), 97 Fed. Cl. 277, 306 (2011) (stating that in "a fixed-price contract[,] . . . the risk for not performing at the contractually binding price falls squarely and exclusively on the contractor[]"). However, an agency "may" perform price realism analyses[36] "on competitive fixed-price-type contracts when

---

[35] "Price reasonableness generally addresses whether a price is too high . . . ." First Enter. v. United States, 61 Fed. Cl. 109, 123 (2004); see DMS All-Star Joint Venture v. United States (DMS), 90 Fed. Cl. 653, 657 n.5 (2010) ("[A] price reasonableness analysis has the goal of preventing the government from paying too much for contract work."). "Normally, competition establishes price reasonableness." FAR 15.305(a)(1). In accordance with the FAR, the Solicitation provided that the Agency's evaluation of proposals would "include an assessment of the reasonableness of the proposed prices to accomplish the solicitation requirements" and stated that the Agency "may reject a proposal which is not . . . reasonable[] as to price." AR 278 (RFP); cf. supra Part I.D (discussing the price evaluation reports in which the Agency analyzed the reasonableness of the offerors' prices). Plaintiff does not raise any arguments with respect to the Agency's price reasonableness analysis.

[36] Of note, the FAR does not explicitly address price realism. See DMS, 90 Fed. Cl. at 663 ("A 'price realism analysis,' a term not employed in the FAR, examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals, and may include the cost realism analysis referenced in FAR 15.404-1(d)."); Ralph C. Nash & John Cibinic, Price Realism: It's Different from Price Reasonableness, 17 No. 3 Nash & Cibinic Rep. ¶ 14 (2003) (stating that FAR 15.404-1(d)(3) "is a cryptic way of dealing with price realism by addressing the use of cost realism on fixed-price type contracts"); cf. Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 355 (2009) (stating that "cost realism" is "frequently referred to as price realism" (internal quotation marks omitted)).

new requirements may not be fully understood by competing offerors," and the "[r]esults of the analysis may be used in performance risk assessments and responsibility determinations," FAR 15.404-1(d)(3); see Ceres, 97 Fed. Cl. at 303 ("[A]n agency may, at its discretion, provide for the use of a price realism analysis to measure an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance from a contractor who is forced to provide goods or services at little or no profit."). A price realism analysis addresses whether the offeror "is proposing a price so low that performance of the contract will be threatened." DMS, 90 Fed. Cl. at 657 n.5; see Ceres, 97 Fed. Cl. at 303 ("Arguments that an agency did not perform an appropriate analysis to determine whether prices are too low, such that there may be a risk of poor performance, concern price realism." (internal quotation marks omitted)). The results of an agency's price realism analysis cannot be used to adjust the offered prices. See FAR 15.404-1(d)(3).

"[U]nless the agency commits itself to a particular methodology in a solicitation," Afghan Am., 90 Fed. Cl. at 358, "the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion," id. at 357 (internal quotation marks omitted); see Ceres, 97 Fed. Cl. at 303 ("The Court's review of the agency's [price realism] analysis is limited to determining whether the evaluation was reasonable and consistent with the solicitation's evaluation criteria."). "The agency's discretion is even more pronounced when the Solicitation is silent regarding the methodology to be used in conducting a price realism analysis . . . ." Afghan Am., 90 Fed. Cl. at 358 (internal quotation marks omitted); see Ne. Military Sales, Inc. v. United States, 100 Fed. Cl. 103, 118 (2011) (stating that an agency "enjoy[s] broad discretion in conducting its price realism analysis" when "[t]he Solicitation does not describe the methodology required to conduct [a] price realism analysis" (first alteration in original) (internal quotation marks omitted)). However, if an agency made "irrational assumptions or crucial miscalculations," the court may find that the agency's price realism analysis lacked a rational basis. Afghan Am., 90 Fed. Cl. at 358 (internal quotation marks omitted); see Ceres, 97 Fed. Cl. at 307 ("This Court recognizes that an agency's price-realism analysis lacks a rational basis if the contracting agency made irrational assumptions or critical miscalculations or used an evaluation method that produced a misleading result." (internal quotation marks omitted)).

Here, the Solicitation neither required that the Agency perform a price realism analysis nor provided that, if the Agency did perform a price realism analysis, a particular methodology must be used. See AR 276-78 (RFP) (stating the evaluation factors for the contract award). Instead, the Solicitation stated that the Agency "may" reject a proposal that "reflects an inherent lack of technical competence or a failure to comprehend the complexity and risks required to perform the solicitation requirements due to submission of a proposal which is unrealistically . . . low in price," id. at 276; see id. at 278 (stating that the Agency "may reject a proposal which is not realistic . . . as to price"), or that

"contains any unexplained significant inconsistency between the proposed effort and cost and/or price, which implies the offeror [either] . . . has an inherent misunderstanding of the [SOW], or . . . has an inability to perform the resultant contract," id. at 276. Given that Entwistle's price was approximately [* * *]% lower than that of the next lowest offeror's price, see AR 1905 (SSDD) (observing that the next lowest offeror's price was [* * *]% higher than Entwistle's), the contracting officer acted within the Agency's discretion, cf. Afghan Am., 90 Fed. Cl. at 357-58, and "employed cost analysis[37] techniques to determine whether it [was] reasonable to conclude that Entwistle [could] perform the requirements of the contract based on its offered price," AR 1906 (SSDD) (footnote added); cf. Tr. 20:20-22 (Ms. Duncombe) (stating that the Agency performed a price realism analysis because Entwistle's price was significantly lower than that of the other offerors).

Further, where a solicitation provides that an agency may perform a price realism analysis to assess "an offeror's understanding of the solicitation's requirements" or to "assess[] the risk inherent in an offeror's proposal," an acceptable price realism methodology might include "comparison of the prices received with each other; comparison of previously proposed prices for the same or similar items; comparison with the [IGCE]; and analysis of pricing information provided by the offeror." Afghan Am., 90 Fed. Cl. at 358. Here, the Agency compared Entwistle's estimated material costs to those of the other offerors and the IGCE, see infra Part III.D.1, evaluated Entwistle's estimated prices of the engine, tank and frame, see infra Part III.D.2, and compared Entwistle's proposed labor hours to those of the other offerors, see infra Part III.D.3; see also AR 1906 (SSDD) (stating that "[t]he applied cost analysis techniques consisted of a comparison of cost elements, and a review of Entwistle's labor hours and material type(s) to determine risk of successful performance at the offered price"); Tr. 20:23-21:8 (Ms. Duncombe) (describing the Agency's price realism methodology). Based on this analysis, the Agency concluded that Entwistle's price was not unrealistically low. See AR 1906-08 (SSDD) (describing the Agency's findings).

Plaintiff argues that the Agency's price realism analysis lacked a rational basis. See Pl.'s Mot. 31. Plaintiff states that "[a]lthough the Agency attempted to use several acceptable methods to analyze Entwistle's price, . . . its analyses failed because they were based on irrational assumptions and/or critical miscalculations." Id. at 21; see Pl.'s Resp. 10 ("[I]t is not the methodology that Mil-Mar challenges; it is the implementation of the methodology."); see also Tr. 21:9-13 (Ms. Duncombe) ("[O]n its face, it sounds like this

_____

[37] FAR 15.404-1(c)(1) defines "[c]ost analysis" as "the review and evaluation of any separate cost elements and profit or fee in an offeror's . . . proposal, as needed to determine . . . cost realism." FAR 15.404-1(c)(1); see FAR 15.404-1(a)(4) (stating that cost analysis may be used "to determine . . . cost realism"). "[W]hen contracting on a firm-fixed-price . . . basis, comparison of the proposed prices will usually satisfy the requirement to perform a price analysis, and a cost analysis need not be performed." FAR 15.305(a)(1).

would be a reasonable methodology, but once you get into it and really look at the things that they compared, it demonstrates that it was simply done to justify Entwistle's price."). Specifically, plaintiff contends that the Agency employed irrational material cost comparison techniques, conducted an irrational evaluation of Entwistle's frame and conducted an irrational comparison of labor hours. See Pl.'s Mot. 32. Plaintiff also accuses the Agency of cherry-picking its price realism analysis "in an effort to find a few numbers to reach its desired end, i.e., that Entwistle's significantly lower price is realistic and poses no undue risk to the Government." Id. at 31.[38]

Defendant counters that there is no basis to conclude that the Agency's price realism analysis lacked a rational basis, see Def.'s Reply 5-6, and that plaintiff's arguments to the contrary "simply amount to a disagreement with the agency's reasoning," Tr. 73:17-19 (Ms. Thomas); see Def.'s Mot. 38 (claiming that plaintiff's arguments amount to "nothing more than . . . unsupported disagreements with the substance of the agency's conclusions"). Defendant further contends that plaintiff's arguments "all involve exactly the sort of flaw that Mil-Mar accuses the agency's analysis of including." Tr. 72:11-13 (Ms. Thomas). That is, defendant accuses plaintiff of "cherry pick[ing]" comparisons that "Mil-Mar believes support[] the conclusion it wants to reach, which is Entwistle's price was too low." Id. at 72:14-16; accord Tr. 82:18-23 (Henry E. Steck) ("[W]e can slice and dice these cost proposals 25 different ways and pick out parts and say . . . we think the agency compared this to that, but it should have compared something else. Those were judgments within the agency's discretion."). Defendant observes that the price realism analysis that the Agency conducted sufficiently satisfied the Agency that Entwistle's price did not reflect either "a lack of understanding of the requirements of the contract" or "that Entwistle wasn't capable of meeting the requirements of the contract." Tr. 71:8-15 (Ms. Thomas); see id. at 68:8-10 (claiming that the Agency "looked extensively at Entwistle's price" and "determined that it wasn't undertaking any particular risk"); cf. AR 276 (RFP) (stating

---

[38] Plaintiff contends that the Agency demonstrated a "willingness to ignore any information that called into question Entwistle's understanding of the technical requirements." Pl.'s Mot. 31; see Tr. 17:15-19 (Ms. Duncombe) (claiming that "the agency was blinded by [Entwistle's] low price, and [that the agency] really wanted to find a way to make sure this really substantially lower price proposal could be awarded the contract"). To the extent plaintiff claims that the Agency carried out its price realism analysis in bad faith, plaintiff has failed to rebut with "well-nigh irrefragable proof" the presumption that "government officials discharge their duties, correctly, lawfully, and in good faith." John Massman Contracting Co., 23 Cl. Ct. at 33 (internal quotation marks omitted); see also Schism, 316 F.3d at 1302 (stating that government officials are presumed to "perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations . . . and [that this presumption] is valid and binding unless well-nigh irrefragable proof rebuts or overcomes it" (internal quotation marks and citation omitted)); cf. supra note 31 (finding that, with respect to the Agency's overall evaluation of the proposals, plaintiff failed to rebut the presumption that government officials properly perform their duties).

that the Agency may reject a proposal that reflects either "an inherent misunderstanding of the scope of the work, or . . . an inability to perform the resultant contract").

For the following reasons, the court finds that the Agency's price realism analysis was rationally based.

1.      The Agency's Comparison Techniques for Material Costs Was Rationally Based

As part of its price realism analysis of Entwistle's material costs, the Agency compared two categories of Entwistle's material costs--costs of parts below $500 and total material costs (the sum of parts above and below $500)--to those of the other offerors and the IGCE. See AR 1906 (SSDD) (comparing costs). The material cost information relied on by the Agency is provided in the following chart:

| | [* * *] | Entwistle | [* * *] | [* * *] | [* * *] | Mil-Mar | [* * *] | IGCE |
|---|---|---|---|---|---|---|---|---|
| Parts > $500 | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] |
| Parts < $500 | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | - |
| Total Costs | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] | $[* * *] |

See id. With respect to parts below $500, the Agency observed that Entwistle was "within the range of the other offerors, particularity that of [* * *], [* * *] and Mil-Mar (the second, third and fourth low offerors), whose prices are within [* * *]% of each other." Id. With respect to total material costs, which account for "66% to 87% of total price," the Agency observed that "Entwistle's total material cost of $[* * *] compare[d] favorably to the IGCE cost of $[* * *]." Id.

Plaintiff contends that the Agency's analysis of these two categories does not support the realism of Entwistle's price. See Pl.'s Mot. 22-24. First, plaintiff argues that the costs of parts below $500 "is a small category of the total cost (10% to 30%) for the Hippo," id. at 23, so relying "on that to determine if Entwistle understood the complexity of this RFP or whether [Entwistle's] price was realistic really doesn't make sense," Tr. 24:17-20 (Ms. Duncombe). Second, plaintiff argues that, instead of "compar[ing] Entwistle's total material costs to any of the other offerors," the Agency compared Entwistle's total material costs to those of the IGCE "because that's the only one that it would have been comparable to." Id. at 22:21-23; see id. at 23:16-18 (claiming that the

Agency "chose the one thing that it could compare[,] the IGCE to Entwistle[,] to find that [Entwistle's] cost was realistic").[39]

Plaintiff argues that the Agency should have instead looked at the costs of parts above $500. See Pl.'s Mot. 23-24. As plaintiff sees it, "it makes no sense that the Agency completely disregarded the costs of the Parts Above $500 among the offerors and the IGCE, especially [because] that is the category where the offerors' costs show the greatest disparity." Id. at 23. Plaintiff also argues that the Agency "ignored" the fact that the most important and expensive parts of the Hippo are those above $500--the tank and the frame. See id. at 22, 24. As support, plaintiff cites to an August 28, 2012 Final SSA Brief that includes a chart titled "Comparison of Common Material Items Over $500." See id. at 24 (citing AR 2336 (Final SSA Brief)). A modified[40] excerpt of this chart, showing only the costs of the tank and frame (whether bid separately or together), is below:

| Item | [* * *] | Entwistle | [* * *] | [* * *] | [* * *] | Mil-Mar | [* * *] | IGCE |
|---|---|---|---|---|---|---|---|---|
| Tank/ Frame | $[* * *] | -- | -- | $[* * *] | -- | $[* * *] | -- | |
| Tank | -- | $[* * *] | $[* * *] | -- | -- | -- | $[* * *] | $[* * *] |
| Frame | -- | $[* * *][41] | $[* * *] | -- | -- | -- | $[* * *] | $[* * *] |

[39] Plaintiff also argues that the Agency "totally ignore[d] the fact that Entwistle's proposal was missing information about its material costs." Pl.'s Mot. 22-23; see Tr. 22:25-23:9 (Ms. Duncombe) (stating that the Agency "ignored the fact that Entwistle's proposal was missing information" regarding the cost of the frame as well as costs of parts below $500); cf. id. at 24:21-25:22 (explaining how the Agency calculated Entwistle's cost of parts below $500). The record does not support plaintiff's argument. As discussed in Part III.C above, the Agency recognized that Entwistle did not provide all of the requested material cost information in its Attachment 16 but concluded that the omitted information "was not significantly material." See AR 1785 (Entwistle PER); supra Part III.C. Therefore, the Agency did not "entirely fail[] to consider an important aspect of the problem." Cf. Ala. Aircraft Indus., Inc.-Birmingham v. United States (Ala. Aircraft), 586 F.3d 1372, 1376 (Fed. Cir. 2009) (internal quotation marks omitted). Instead, the court finds that "[t]he agency is going into this procurement with its eyes wide open." Cf. Ceres Envtl. Servs., Inc. v. United States (Ceres), 97 Fed. Cl. 277, 306 (2011).

[40] The chart in the Final SSA Brief included additional information but did not include a row that tabulated the total prices or a column for the IGCE. See AR 2336 (Final SSA Brief). The court notes that the price for the frame in the IGCE does not include labor hours, see AR 1872 (IGCE) (listing material costs only); cf. supra note 32 (calculating $[* * *] as the total cost of the IGCE frame, inclusive of materials and labor), but that the price for Entwistle's frame does include labor hours, in addition to other expenses, see infra note 41.

[41] The SSA calculated the cost of Entwistle's ISO frame because this information was not provided by Entwistle. See AR 2336 (Final SSA Brief) (stating that the cost of Entwistle's frame consisted of "material + direct labor + [overhead], [general and administrative expenses],

| Total | $[* * *] | $[* * *] | $[* * *] | $[* * *] | -- | $[* * *] | $[* * *] | $[* * *] |
|---|---|---|---|---|---|---|---|---|

see AR 2336 (Final SSA Brief); AR 1872 (IGCE).[42]  According to plaintiff's calculations, the total cost of Entwistle's tank and frame is [* * *]% lower than that of the IGCE, Pl.'s Mot. 25, and "would have to increase by nearly [* * *]% to reach the next lowest offer for these same two items ([* * *]'s estimate of $[* * *])," id. at 24 (emphasis omitted). Plaintiff concludes that had the Agency considered this "readily apparent information" it would have realized "just how understated Entwistle's prices were on the Hippo's most important (and costly) components." Id. at 25.  However, the "calculations" offered as part of plaintiff's argument, see id. at 24-25, result in an overstatement of the difference between the numbers compared.  For example, the difference between the total cost of Entwistle's tank and frame and the total cost of the IGCE tank and frame is $[* * *].  See AR 2336 (Final SSA Brief) (listing $[* * *] as the total cost of Entwistle's tank and frame); AR 1872 (IGCE) (listing $[* * *] as the total cost of the IGCE tank and frame); cf. supra note 40 (noting that the cost of the IGCE frame does not include labor hours). The $[* * *] difference does not reflect, as plaintiff claims, that the price of Entwistle's tank and frame was [* * *]% lower than the price of the IGCE tank and frame.  Cf. Pl.'s Mot. 25.  Instead, the $[* * *] difference reflects that the price of the IGCE tank and frame was approximately [* * *]% higher than that of Entwistle[43] or, stated another way, that Entwistle's price was approximately [* * *]% lower than the price of the IGCE tank and frame.[44]

Defendant contends, and the court agrees, that nothing in the Solicitation required the Agency to make observations about the costs of parts over $500, Def.'s Reply 7, or to compare Entwistle's total material costs to those of the other offerors.  Such matters are

---

Profit"); Pl.'s Mot. 24 n.15; cf. AR 1907 (SSDD) (stating that the Agency calculated a cost of $[* * *] for Entwistle's ISO frame).

[42]  [* * *], [* * *] and Mil-Mar planned to purchase the tank and frame as a combined unit, see AR 1839-40 (Final Price Evaluation Report (Final PER)); Tr. 27:20-22 (Ms. Duncombe); [* * *] planned to purchase the tank and frame separately, Tr. 27:23-24 (Ms. Duncombe); see AR 1839 (Final PER); [* * *] and Entwistle planned to purchase the tank and manufacture the frame, AR 1839, 1841 (Final PER); Tr. 27:25-28:1 (Ms. Duncombe); and [* * *] planned to manufacture both the tank and the frame, AR 1840 (Final PER).  The IGCE was based on purchasing the tank and manufacturing the frame.  See AR 1872, 1874 (IGCE).

[43]  The court reached this figure by dividing the difference between the total cost of Entwistle's tank and frame and the total cost of the IGCE tank and frame ($[* * *]) by the total cost of Entwistle's tank and frame ($[* * *]).

[44]  The court reached this figure by dividing the difference between the total cost of Entwistle's tank and frame and the total cost of IGCE tank and frame ($[* * *]) by the total cost of IGCE's tank and frame ($[* * *]).

entirely within the Agency's discretion.  See Afghan Am., 90 Fed. Cl. at 357-58.
According to defendant, "[t]he SSA expressly chose to compare the IGCE materials cost
to Entwistle's materials cost because materials costs represented the overwhelming
majority of the total costs involved in performance of the contract."  Def.'s Mot. 36-37;
see Tr. 72:23-73:2 (Ms. Thomas) ("The agency identified the aspects of the price that it
believed were important.  Notably, the materials cost, because that did represent for every
offeror between 66 and 83 percent of the total cost . . . .").  To the extent plaintiff argues
"that the agency 'ignored,' 'completely disregarded,' or 'failed to evaluate' a variety of
pieces of information related to price," Def.'s Mot. 36 (quoting Pl.'s Mot. 23), defendant
argues that plaintiff is merely "complaining that the agency did not conclude . . . that
Entwistle's price was unrealistic," id. at 37.  Indeed, the record does not support
plaintiff's argument that the Agency ignored the most expensive and important parts of
the Hippo--namely the tank and frame.  Cf. Pl.'s Mot. 22, 24.  As intervenor correctly
observes, "[t]he total material cost assessed by the [Agency] would necessarily include
the cost of those major components," and, "[f]urther, the SSDD specifically documents
the [Agency's] evaluation of Entwistle's pricing for the water tank [and] ISO frame."
See Intervenor's Mot. 26; infra Part III.D.2 (discussing the Agency's evaluation of
Entwistle's costs of the tank and frame).

Further, where, as here, a solicitation is silent as to the methodology to be used in
performing a price realism analysis, the Agency "enjoy[s] broad discretion in conducting
its price realism analysis."  Ne. Military Sales, Inc., 100 Fed. Cl. at 118 (alteration in
original) (internal quotation marks omitted).  Plaintiff has simply failed to establish that
the Agency's examination of total material costs and the costs of parts below $500 relied
on "irrational assumptions" or made "crucial miscalculations."  Cf. Afghan Am., 90 Fed.
Cl. at 358 (internal quotation marks omitted).  Therefore, "given the deference to be
afforded the agency in price realism assessments and the agency's willingness to assume
risk," Ceres, 97 Fed. Cl. at 308; cf. AR 1786 (Entwistle PER) (observing that "utilizing a
firm-fixed price contractual instrument . . .  mitigates the Government's risk"), the court
finds that the Agency's price realism analysis of the material costs was reasonable and
had a rational basis.

2.      The Agency's Evaluation of the Frame Was Rationally Based

The Agency's price realism analysis also included an evaluation of Entwistle's
engine, tank and frame.  See AR 1906 (SSDD).  The Agency's analysis of Entwistle's
engine and tank, which plaintiff does not contest, see Pl.'s Mot. 25-28 (disputing only the
Agency's analysis of the frame), included performing market research, reviewing quotes
provided by Entwistle, and securing review by the United States Army Tank Automotive
Research, Development and Engineering Center (TARDEC), see AR 1906-07 (SSDD);
AR 1869 (Memorandum for Record (MFR)) (discussing the reviews by TARDEC).  The
Agency's analysis of Entwistle's frame included reviews obtained from a Production
Capability evaluator and a TARDEC engineer.  See AR 1907 (SSDD).  The following

passage contains the full discussion in the SSDD of the Agency's price realism analysis of Entwistle's frame:

> Entwistle provided a material cost of $[* * *] plus [* * *] labor hours to fabricate the ISO frame. Using [the Agency's] IGCE template in the Electronic Resource Center, the Government calculated an estimated price of $[* * *] for the frame. The Production Capability evaluator and a TARDEC engineer who specializes in structural weldments looked at completed HIPPO ISO frame[s]. As a result of their review, we have no basis to question the [* * *] hours.

Id.

Plaintiff argues that the Agency's evaluation of the frame was "irrational and incomplete," Pl.'s Mot. 25, because the Agency did not properly review Entwistle's estimated labor hours and material costs of the frame, Tr. 6:12-14 (Ms. Duncombe). Plaintiff first argues that the Agency failed to offer "substantive consideration of the [* * *] [labor] hours" proposed by Entwistle to fabricate the frame. Pl.'s Mot. 26. The record does not support plaintiff's contention. As referenced in the SSDD, the Agency asked TARDEC to review the frame. See AR 1907 (SSDD); Pl.'s Mot. 26. In an e-mail dated August 29, 2012, a TARDEC engineer, Catherine Thomas, offered her evaluation of the [* * *] hours Entwistle estimated it would take to manufacture the frame: "Based on review of [an] ISO frame on a completed Hippo from [Agency] inventory[45] and in my role of production capability, I cannot conclude that an offeror, with [* * *] hours of machining and [* * *] hours of welding, will not be able to successfully perform and meet the solicitation requirements." AR 1868 (Aug. 29, 2012 e-mail) (footnote added). Also in the record is an undated Memorandum for Record signed by the SSA Advisor, Bob Shalewitz, and the Source Selection Experience Factor Chief, Christopher Bensch (Mr. Bensch), stating that "TARDEC has reviewed the estimated labor hours proposed by [Entwistle] for the fabrication of ISO frames, and cannot conclude them to be deficient for an effort of such scope and magnitude." AR 1869-70 (MFR). Given the foregoing, the court finds reasonable the Agency's reliance on the reviews of TARDEC in its

---

[45] Plaintiff argues that the United States Army Tank Automotive Research, Development and Engineering Center (TARDEC) based its review of Entwistle's labor hours on "an actual completed Hippo ISO frame from the Agency's inventory," or, in other words, a frame manufactured by Mil-Mar's subcontractor. See Pl.'s Mot. 26. Plaintiff contends, without citation, that Mil-Mar estimates that "it takes [* * *] hours to fabricate the ISO frame[,] . . . more than [* * *] the number of hours proposed by Entwistle." Id. (emphasis omitted). Defendant counters that plaintiff relies on information that is not in the record in its calculation of "the number of labor hours supposedly required by Mil-Mar's subcontractor to make a Hippo frame." Def.'s Mot. 40 n.6. Plaintiff does not respond to defendant's argument. The court does not consider plaintiff's unsupported factual contention in reaching its decision.

evaluation of the [* * *] labor hours proposed by Entwistle to fabricate the frame and finds that this evaluation, to the extent it informed the Agency's price realism analysis of Entwistle's frame, had a rational basis.

Plaintiff next argues that the record does not support "that the Agency analyzed the price of the <u>materials</u> proposed by Entwistle to construct the ISO frame," Pl.'s Resp. 13, and that "[t]here is nothing to support the realism of Entwistle's material cost for the ISO frame," Pl.'s Mot. 27. Plaintiff contends that, although TARDEC engineer Catherine Thomas addressed the number of labor hours proposed by Entwistle to manufacture the frame in the August 29, 2012 e-mail, she "never evaluated the ISO frame material cost supplied by Entwistle." <u>Id.</u> (capitalization and emphasis omitted). Plaintiff also contends that the frame requires a significant amount of expensive steel, <u>see id.</u> at 26, and notes that the IGCE's estimated material cost of the frame was $[* * *], nearly three times greater than Entwistle's estimated material cost of $[* * *], <u>see id.</u> (citing AR 1872 (IGCE)); <u>cf. supra</u> Part III.D.1 (finding that the Solicitation did not require the Agency to make specific observations about or comparisons of the costs of parts over $500 and that such matters are within the Agency's discretion).

Defendant counters that "the agency <u>did</u> evaluate the cost of Entwistle's Hippo frame" and cites as support the following statement in the Memorandum for Record, Def.'s Mot. 37: "TARDEC has reviewed the estimated material cost quoted by [Entwistle] for fabrication of the ISO frame, and cannot conclude the proposed solution won't meet the technical requirements of the solicitation at the estimated material cost," AR 1869 (MFR). Claiming that the Memorandum for Record statement "is untrue, unfounded, and undocumented," Pl.'s Mot. 27, plaintiff contends that "the only document written by the TARDEC engineer with regard to the ISO frame" is the August 29, 2012 e-mail, which "contains nothing relative to the cost of the materials to construct the frame," Pl.'s Resp. 12-13. However, as defendant points out, <u>see</u> Def.'s Reply 7, the Memorandum for Record is signed by Mr. Bensch, himself a TARDEC engineer, <u>see</u> AR 1870 (MFR); AR 2674 (Acquisition Plan) (identifying Mr. Bensch as a system engineer for TARDEC). The court agrees with defendant that "[t]here is no reason to doubt Mr. Bensch's statement that TARDEC reviewed and found no fault with Entwistle's estimate of the materials cost of the frame."[46] Def.'s Reply 7. Therefore, to the extent that the

_____

[46] During oral argument, plaintiff's counsel cited <u>Cohen Financial Services, Inc. v. United States</u> (<u>Cohen</u>), No. 13-37, 2013 WL 1367653 (Fed. Cl. Mar. 27, 2013) as support for the proposition that, if there is no supporting documentation for TARDEC's conclusion, then the Court is unable to determine whether the Agency acted arbitrarily, <u>see</u> Tr. 30:21-31:14 (Ms. Duncombe). The court finds plaintiff's reliance on <u>Cohen</u> misplaced.

<u>Cohen</u> involved a solicitation issued by the Federal Deposit Insurance Corporation (FDIC). <u>Cohen</u>, 2013 WL 1367653, at *1. The FDIC uses an Acquisition Policy Manual (APM) and a manual titled Acquisition, Procedures, Guidance and Information (PGI) with FDIC-specific requirements. <u>See id.</u> at *3-4. One such requirement mandates that the FDIC Technical

Agency relied on the reviews of TARDEC in its analysis of Entwistle's material cost of the frame, the court finds this reliance reasonable.[47]

Plaintiff has failed to establish that, by relying on the reviews of TARDEC engineers, the Agency made "irrational assumptions or crucial miscalculations." Cf. Afghan Am., 90 Fed. Cl. at 358 (internal quotation marks omitted). "[G]iven the deference to be afforded the agency in price realism assessments and the agency's willingness to assume risk," Ceres, 97 Fed. Cl. at 308; cf. AR 1786 (Entwistle PER) (observing that "utilizing a firm-fixed price contractual instrument . . . mitigates the

---

Evaluation Panel (Panel) "determin[e] price realism and document[] its analysis in either the [Panel] Report or a written memorandum to the [contracting officer]." Id. at *15 (some alterations in original) (internal quotation marks omitted); see id. at *1 (identifying the Panel). The court found that, in violation of the foregoing APM and PGI requirement, the FDIC's "single paragraph stating only that [a price realism] analysis was performed, together with a chart showing each offeror's overall proposed price," did not constitute adequate documentation. See id. at *15. The court stated that, "[w]ithout a description of the facts analyzed, and the reasoning that connects the facts with the conclusions, the court is not in a position to determine whether an agency exercised its discretion in a non-arbitrary manner." Id.; cf. Tr. 31:9-14 (Ms. Duncombe) (invoking this language from Cohen).

Here, the court considers the adequacy of the Agency's evaluation of Entwistle's estimate of the material cost of the frame in light of the FAR and the terms of the Solicitation and finds the explanation for the Agency's evaluation adequate.

[47] Moreover, even if the Agency had not analyzed the material cost of Entwistle's frame, nothing in the Solicitation requires that the Agency examine this information as part of a price realism analysis. These are matters that are entirely within the Agency's discretion, cf. Afghan Am., 90 Fed. Cl. at 358 ("[T]he nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation."), and the court will not second guess the Agency's decision to accept the risk associated with Entwistle's prices, cf. Ceres, 97 Fed. Cl. at 306 (stating that, where "[t]he agency is going into [a] procurement with its eyes wide open as to lower-than-expected pricing," the agency's decision "to take the risk associated with those low prices . . . is a business judgment and should not be second-guessed by [the] court"). Despite plaintiff's arguments to the contrary, see Tr. 31:15-25 (Ms. Duncombe) (claiming that an analysis of the material cost of the frame was necessary to conclude that Entwistle's "overall price was realistic and that it understood the complexity of performing this contract"), as discussed in Part III.C above, the Agency did not consider the material cost of Entwistle's frame to be "significantly material," see AR 1785 (Entwistle PER); supra Part III.C (finding that the Agency's decision had a rational basis). Accordingly, to the extent the Agency failed to analyze the material cost of Entwistle's frame as part of its price realism analysis, the Agency did not "entirely fail[] to consider an important aspect of the problem." Cf. Ala. Aircraft, 586 F.3d at 1376 (internal quotation marks omitted).

Government's risk"), the court finds that the Agency's price realism analysis of the frame was reasonable and had a rational basis.

3.      The Agency's Comparison of Labor Hours Was Rationally Based

In addition to evaluating the price realism of Entwistle's material costs and Entwistle's prices for the engine, tank and frame, the Agency evaluated whether Entwistle's labor hours and labor cost were realistic.  See AR 1906-07 (SSDD).  As part of this evaluation, the Agency created a table, which appears below, that compares the offerors' proposed labor hours for first article test (FAT) units and first year production:

| | [* * *] | Entwistle | [* * *] | [* * *] | [* * *] | Mil-Mar | [* * *] |
|---|---|---|---|---|---|---|---|
| FAT & 1st Yr Prod Labor Hrs | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |

Id. at 1906.  The Agency determined that "Entwistle's labor hours for first article test and first year Production combined are within the range of the other offerors, particularly that of Mil-Mar and [* * *] whose hours are within [* * *]% of each other."[48]  Id. at 1907.  The Agency referenced Entwistle's response to the Agency's fourth request for clarification:  "Entwistle stated it estimated production labor hours for each labor category based on its understanding of the RFP requirements.  Based on its experience with design programs, [Entwistle] applied a factor to the production hours to arrive at the first article labor hours."  Id.; see supra Part I.C (discussing requests for clarification).  The Agency also referenced a review by TARDEC, which, according to the Agency, "gave credence to [Entwistle's] projected first article hours, indicating the total sum of hours is plausible for an effort of such scope and magnitude."  AR 1907 (SSDD).

With respect to labor cost, Entwistle estimated $[* * *] in labor cost per Hippo, which consisted of "[* * *] hours associated with machining, welding and assembly."  Id.  The Agency observed that "Entwistle's unit labor cost of $[* * *]/unit appears low when compared to the other offerors with respect to the 1st year production labor cost."  Id.  However, the Agency also noted that "the average proposed labor cost [for each of the offerors] is [* * *]% of total price,"[49] and, because "Entwistle's labor cost is within [* * *]% of [this] average and [* * *]% of its total price," the Agency considered Entwistle's labor cost "reasonable."  Id.  Plaintiff does not raise any specific arguments concerning the Agency's evaluation of Entwistle's labor cost per unit.

---

[48]  The court does not know what comparative calculation the Agency employed to reach the conclusion that certain offerors' hours were "within 7% of each other."  Cf. AR 1907 (SSDD).

[49]  The Agency excluded [* * *] in calculating "the average proposed labor cost" because [* * *]'s "labor cost and price far exceeds the other six offerors."  Id.

Plaintiff contends that the Agency's comparison of "the offerors' labor hours for proposed FAT and first year production . . . was based on irrational assumptions and critical miscalculations that fail[ed] to consider the offerors' unique methods of performance." Pl.'s Mot. 28; see Pl.'s Resp. 13 (stating that, despite the Agency's recognition of "how low Entwistle's unit labor cost appears when compared to other offerors, the Agency fails to consider why the hours are lower, or whether its comparison to other offerors was on equal footing"). Plaintiff contends that, in reaching its conclusion that Entwistle's proposed labor hours were realistic, the Agency irrationally assumed "that it was comparing apples to apples." Pl.'s Mot. 28. Specifically, plaintiff contends that the Agency made the following irrational assumptions: (1) that all of the offerors were proposing the same categories of labor, (2) that analyzing offerors' first year production and FAT unit labor hours combined "was a valid period for comparison among offerors," and (3) that all of the offerors included fabrication hours for the frame in their proposals. See id. at 31.

As to the first alleged irrational assumption, plaintiff contends that "the total [labor] hours proposed by each offeror reflect different categories of work," and argues that the Agency's understanding that it was "comparing apples to apples . . . was an irrational assumption." Id. at 30. As an illustration, plaintiff points to the approaches employed by Entwistle and Mil-Mar. Id. Mil-Mar's labor hours are divided into the following three categories: production, program management/engineering and quality, AR 1128 (Mil-Mar's Attachment 16), whereas Entwistle's labor hours are divided into the following four categories: machining, welding, assembly and engineering, AR 1658 (Entwistle's Attachment 16). Plaintiff further contends that a "[r]eview of the other offerors' Attachment 16's reveals that the other offerors also proposed labor categories in different manners." Pl.'s Mot. 30.

Defendant does not dispute that the offerors categorized their labor hours differently but argues that "there is no indication in the record that the agency was under the impression that all offerors were categorizing labor hours similarly." Def.'s Mot. 39. The court agrees. The Solicitation required offerors to "include the total proposed direct labor hours . . . broken down by proposed labor category." AR 265 (RFP). The Solicitation did not specify what types of labor categories the offerors should list, see id., and the offerors' proposals accordingly reflected a variety of labor categorizations for production, see, e.g., AR 1128 (Mil-Mar's Attachment 16) (dividing labor hours into the following categories: production, program management/engineering and quality); AR 1658 (Entwistle's Attachment 16) (dividing labor hours into the following categories: machining, welding, assembly and engineering); AR 3521 ([* * *]'s Attachment 16) (dividing labor hours into the following categories: shop, administrative and engineering); AR 3720 ([* * *]'s Attachment 16) (dividing labor hours into the following categories: welder, prep, senior welder, assembler, senior assembler, washer, prime/ paint). The court finds that the Agency did not "fail[] to consider an important aspect of

the problem," cf. Ala. Aircraft, 586 F.3d at 1376 (internal quotation marks omitted), and that the Agency's comparison of the offerors' different types of labor hours was reasonable, cf. Ceres, 97 Fed. Cl. at 303 ("The Court's review of the agency's [price realism] analysis is limited to determining whether the evaluation was reasonable and consistent with the solicitation's evaluation criteria."). The court will therefore not substitute its judgment for that of the Agency. Cf. State Farm, 463 U.S. at 43 (stating that "a court is not to substitute its judgment for that of the agency" under the "narrow" APA standard of review).

Regarding the second alleged irrational assumption, plaintiff argues that combining FAT and first year production hours fails to take into account each offeror's approach and "makes Entwistle look less out of sync with Mil-Mar." Pl.'s Mot. 30. Plaintiff contends that Entwistle "had to factor in significant engineering time for the FAT units, as it has never designed or produced a Hippo." Id. Plaintiff points out that Mil-Mar's proposal dedicated approximately [* * *] labor hours to FAT units, whereas Entwistle's proposal dedicated [* * *] labor hours to FAT units. Id.; see AR 1658 (Entwistle's Attachment 16); AR 1128 (Mil-Mar's Attachment 16). Plaintiff alleges that "the Agency failed to consider the fact that Entwistle's FAT labor hours were significantly higher than its first year . . . production labor hours" and "whether Entwistle had proposed sufficient labor to actually manufacture the Hippos over the life of the contract (subsequent to FAT production)." Pl.'s Resp. 15.

As defendant suggests, see Def.'s Mot. 39, the Solicitation did not require the Agency to compare the offerors' first-year hours alone or FAT unit hours alone. Such matters are entirely within the Agency's discretion, cf. Afghan Am., 90 Fed. Cl. at 358 ("[T]he nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation."), and plaintiff has failed to establish that, by comparing the offerors' combined first year production hours and FAT hours, the Agency made an "irrational assumption[]," cf. id. (internal quotation marks omitted). Nor does the court find that the Agency "failed to consider an important aspect of the problem." Cf. Ala. Aircraft, 586 F.3d at 1376 (internal quotation marks omitted).[50]

---

[50]  Moreover, where a particular evaluation suggested by the plaintiff is not required by the Solicitation, the remedy is not, as plaintiff seeks here, to set aside the agency's evaluation, but rather to contest the terms of the solicitation. See Blue & Gold, 492 F.3d at 1313 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the [United States] Court of Federal Claims."). Plaintiff failed to contest the terms of the Solicitation, and its opportunity to do so has passed. Cf. id.

With respect to the third alleged irrational assumption, plaintiff argues that the Agency "should have known that the offerors' proposed labor hours for FAT and first year production would not be comparable," Pl.'s Mot. 29, because two of the offerors ([* * *] and Entwistle) planned to build the frame and buy the tank, [* * *] planned to build both the frame and the tank, and four of the offerors ([* * *], [* * *], [* * *] and Mil-Mar) planned to buy both the frame and the tank, see id.; supra note 42. Plaintiff contends that "the production hours for 4 of the offerors used by the Agency to justify Entwistle's labor hours do not include production hours associated with the tank or the ISO frame being purchased (these hours are already included in the part's price)." Pl.'s Mot. 29; see Pl.'s Resp. 14 (claiming that the Agency failed to "account for differences in technical approach, e.g.[,] the effect that buying larger items would have on an offeror's labor hours").[51] Plaintiff argues that "Entwistle's total [labor] hours, which already include the hours to make the ISO frame, are . . . significantly lower than any of the four other offerors who are buying the tank and ISO frame rather than making it." Pl.'s Mot. 30.

Defendant counters that there is no evidence that in its "comparison of offerors' labor hours" the Agency assumed "that offerors' approaches were identical." Def.'s Mot. 39; see id. at 40 (claiming that all of plaintiff's arguments regarding labor hours are "based upon a false factual predicate: the notion that the agency actually made the assumptions attributed to it by Mil-Mar"). To the contrary, defendant claims that "the agency was well aware that offerors proposed different technical approaches, and different allocations of labor between themselves and subcontractors." Id. at 39. As support, defendant cites to the Final Price Evaluation, see id. (citing AR 1838-41 (Final PER)), in which the Agency details the different approaches of the offerors, see AR 1838-41 (Final PER) (describing the Agency's evaluation of each offeror and noting, for example, that both Entwistle and [* * *] were purchasing tanks and fabricating the frames and that [* * *] was fabricating both the tank and frame); accord AR 1787 (Entwistle PER) (stating that, because Mil-Mar had purchased the water tank as a framed unit, and because Entwistle planned to purchase the water tank and build the frame, the Agency

---

[51] Plaintiff contends that, if the Agency were to consider the number of labor hours necessary to manufacture a frame under Mil-Mar's specifications, Mil-Mar's labor hours would actually be closer to [* * *]. See Pl.'s Mot. 29-30 (asserting that the Agency would have to add approximately [* * *] hours to Mil-Mar's labor hours to make the labor hour estimates of Mil-Mar and Entwistle comparable). Plaintiff reaches this conclusion by multiplying "[* * *] labor hours"--the number of hours that, plaintiff claims, it takes to build a frame--by 371, the sum of the six First Article Test (FAT) units and 311 first year production units. See id. n.2; see also id. at 26 (claiming, without citation, that Mil-Mar estimates that "it takes [* * *] hours to fabricate the ISO frame" (emphasis omitted)). The court does not consider plaintiff's unsupported factual contention regarding the [* * *] hours allegedly estimated by Mil-Mar to fabricate an ISO frame. See supra note 45. Nor does the court consider plaintiff's allegation regarding the [* * *] labor hours because it is also based on plaintiff's unsupported factual contention.

considered impossible "an 'apples to apples' comparison between the [historical price of the water tank/frame] and the [water] tank that Entwistle is offering").  Plaintiff concedes that "the Agency may have been aware of the offerors' different technical approaches," but argues that the record does not suggest that the Agency "took that information into consideration when it compared the offerors' labor hours, or that it ever considered the effect these differences would have on an offeror's proposed labor hours."  Pl.'s Resp. 14.

Plaintiff further contends that "[n]othing in the Record indicates that the Agency was conducting a 'rough check'" by comparing the offerors' total labor hours, id. at 15, and that, "even as a 'rough check,'" the Agency's "comparison of total labor hours for FAT and first year production is so inherently based on mistaken assumptions that . . . it cannot have a reasonable basis," id. at 16; cf. Def.'s Mot. 39 (arguing that the Agency's comparison of offerors' labor hours may have served "simply as a rough check of reasonableness").  The court agrees that the record does not indicate that the Agency considered the fact that total labor hours of Entwistle and [* * *] included hours dedicated to the manufacture of the frame whereas the total labor hours of [* * *], [* * *], [* * *] and Mil-Mar did not.[52]  Therefore, whether the Agency made an "irrational assumption[]" when it compared the offerors' total labor hours is a close call.  Cf. Afghan Am., 90 Fed. Cl. at 358 (internal quotation marks omitted).

However, the Agency's comparison of Entwistle's combined FAT and first year production labor hours to those of the other offerors was only one component of the Agency's price realism analysis of Entwistle's labor hour estimate.  The Agency also had TARDEC review Entwistle's labor hours.  As discussed above, see supra Part III.D.2, based on the review by TARDEC engineer Catherine Thomas, the Agency found "no basis to question" the [* * *] labor hours Entwistle allocated to fabricating the ISO frame, AR 1907 (SSDD); cf. AR 1868 (Aug. 29, 2012 e-mail) (indicating that TARDEC could not "conclude that an offeror with [[* * *] labor hours would] not be able to successfully perform and meet the solicitation requirements").  With respect to the number of hours Entwistle allocated to the FAT units, the Agency found that "TARDEC's assessment . . . gave credence to [Entwistle's] projected first article labor hours."  AR 1907 (SSDD).  This assessment is supported by the Memorandum for Record, which states that "TARDEC has reviewed the direct labor hours proposed for the production of [FAT] units . . . and believes the total sum of hours is plausible for an effort of such scope and magnitude."[53]  AR 1869 (MFR).  The Agency also addressed Entwistle's response to the

---

[52]  The court notes that an "apples to apples" comparison can in fact be accomplished by comparing Entwistle's total labor hours ([* * *]) to those of [* * *] ([* * *]), the other offeror that planned to manufacture a frame.  See AR 1906 (SSDD).  These two figures are within approximately [* * *]% of each other.

[53]  Plaintiff contends "the Government offered nothing in the Record to reflect any assessment by TARDEC of Entwistle's proposed FAT labor hours; it only addressed production

fourth request for clarification, in which Entwistle explained that it applied a factor to its first year production hours to estimate its FAT hours. See AR 1907 (SSDD). Moreover, the Agency's price realism analysis of Entwistle's labor hour estimate was only one component of the Agency's overall price realism analysis. See supra Parts III.D.1-2 (discussing the other components of the Agency's price realism analysis). Based on the foregoing, and noting the fact that this procurement involves a fixed-priced contract, the court is not persuaded that the Agency's comparison of Entwistle's total labor hours to those of the four offerors who planned to purchase the frame warrants disrupting the contract award to Entwistle. Cf. Ceres, 97 Fed. Cl. at 307-08 (finding that an alleged flaw in the agency's price realism analysis did "not warrant disrupting the [contract] award[]," given, among other reasons, the discretion afforded to an agency's price realism analysis and the fact that the contract at issue was a fixed-price contract).

"[G]iven the deference to be afforded the agency in price realism assessments and the agency's willingness to assume risk," Ceres, 97 Fed. Cl. at 308; cf. AR 1786 (Entwistle PER) (observing that "utilizing a firm-fixed price contractual instrument . . . mitigates the Government's risk"), the court finds that the Agency's price realism analysis of the labor hours was reasonable and had a rational basis.

E.      The Agency's Best Value Trade-Off Analysis Was Rationally Based and Consistent with the Solicitation's Evaluation Scheme

As discussed above, see supra Part I.A.2 (addressing Section M of the Solicitation), the Solicitation stated that the SSA would evaluate proposals "using a trade-off process to determine which proposal provides the most advantageous and realistic proposal (i.e.[,] best value) considering the three factors: 1) Production Capability, 2) Experience, and 3) Price," AR 276 (RFP). "[I]n selecting the offer which is most advantageous and represents the best value to the Government," the SSA would consider the total evaluated price and "the relative strengths/weaknesses and risks of each Offeror's proposal in the non-price factors." Id. The Solicitation provided that the most important factor was Production Capability, which was slightly more important than Experience, and that Experience was slightly more important than Price. Id. at 277. When combined, the non-price factors were considered more important than price. Id. at 278. The Solicitation further provided that "the closer the Offerors' evaluations are in the

_____

hours." Pl.'s Resp. 14 (citing AR 1868 (Aug. 29, 2012 e-mail from TARDEC engineer Catherine Thomas to contracting officer Yvette Thompson)). As the court noted above in Part III.D.2, the Memorandum for Record (MFR) is signed by Christopher Bensch (Mr. Bensch), himself a TARDEC engineer. See AR 1870 (MFR); AR 2674 (Acquisition Plan) (identifying Mr. Bensch as a system engineer for TARDEC); supra Part III.D.2. The court finds no reason to doubt Mr. Bensch's statement that TARDEC reviewed and found plausible Entwistle's proposed FAT labor hours. Cf. Part III.D.2 (finding no reason to doubt Mr. Bensch's statement that TARDEC reviewed and found plausible Entwistle's estimate of the materials cost of the frame).

non-price factors, the more important price becomes in the decision." Id. at 277. Moreover, "[n]otwithstanding the relative order of importance of the evaluation factors as stated," the Solicitation provided that "price may be controlling when . . . [t]he advantages of a higher rated, higher price[d] proposal are not considered to be worth the price premium." Id.

A best value "tradeoff process" allows "the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR 15.101–1(a). "[I]n a best-value procurement, the agency may decide to select a lower-technically-rated proposal--even if the solicitation emphasizes the importance of technical merit--if it decides that the higher price of a higher-technically-rated proposal is not justified." Afghan Am., 90 Fed. Cl. at 360 (internal quotation marks omitted); see Serco Inc. v. United States, 81 Fed. Cl. 463, 496 (2008) ("Even where . . . a solicitation provides that technical criteria are more important than price, an agency must select a lower-priced, lower technically scored proposal if it reasonably decides that the premium associated with selecting the higher-rated proposal is unwarranted."). "In determining which proposal represents the best value, the government must compare the relative costs and benefits of the competing proposals, including both price and non-price factors . . . ." FirstLine Transp. Sec., Inc. v. United States (FirstLine), 100 Fed. Cl. 359, 374 (2011) (citing FAR 15.101-1(c)). Moreover, the government must evaluate proposals and "assess their relative qualities solely on the factors and subfactors specified in the solicitation." FAR 15.305(a).

It is the SSA's responsibility to select the proposal that represents the best value to the agency. FirstLine, 100 Fed. Cl. at 382 (citing FAR 15.303(b)(6)). The SSA's best value determination is governed by FAR 15.308, which provides in full:

> The [SSA's] decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

FAR 15.308. This court has found that FAR 15.308 embodies two main requirements. FirstLine, 100 Fed. Cl. at 382; accord One Largo, 109 Fed. Cl. at 95 (same).

First, FAR 15.308 requires the SSA to "reach an independent award decision based on a comparative assessment of proposals against all of the criteria set forth in the solicitation." FirstLine, 100 Fed. Cl. at 382. When assessing differences between

proposals, the SSA should take into consideration not only the proposals' adjectival ratings but also information on advantages and disadvantages of the proposals. Femme Comp Inc. v. United States (Femme), 83 Fed. Cl. 704, 758 (2008). "Looking beyond the adjectival ratings is necessary because proposals with the same adjectival ratings are not necessarily of equal quality." Id. (alteration and internal quotation marks omitted).

Second, FAR 15.308 requires the SSA to "document its independent award decision." FirstLine, 100 Fed. Cl. at 382. "'Conclusory statements, devoid of any substantive content, . . . fall short of' this documentation requirement." Femme, 83 Fed. Cl. at 758 (omission in original) (quoting Serco Inc., 81 Fed. Cl. at 497); see One Largo, 109 Fed. Cl. at 95 ("To be well-documented, the source selection decision must contain more than conclusory and generalized statements." (internal quotation marks omitted)). Thus, the SSA must "do more than simply parrot back the strengths and weaknesses of the competing proposals." Serco Inc., 81 Fed. Cl. at 497. Although the SSA "need not quantify the tradeoffs that led to" his best value determination, FAR 15.308, "this is not to say that the magnitude of the price differential between the two offers is irrelevant--logic suggests that as that magnitude increases, the relative benefits yielded by the higher-priced offer must also increase," Serco Inc., 81 Fed. Cl. at 497. That is, the SSA should not "minimize the potential impact of price" and is cautioned against "mak[ing] a nominal technical advantage essentially determinative, irrespective of an overwhelming price premium." Id. (alteration and internal quotation marks omitted).

"[A] plaintiff bears a significant burden to demonstrate error in the [SSA's] trade-off analysis, because procurement officials have a very high degree of discretion when it comes to best value determinations." One Largo, 109 Fed. Cl. at 96; see E.W. Bliss Co., 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); PlanetSpace Inc., 96 Fed. Cl. at 125 ("An agency's contract award is . . . least vulnerable to challenge when based upon a best value determination." (citing Galen, 369 F.3d at 1330)). Agencies are accorded "a high degree of discretion in best value determinations because it is necessarily a subjective process." One Largo, 109 Fed. Cl. at 96. Therefore, "[t]he Court will not disturb a best-value award so long as the agency documents its final award decision and includes the rationale for any business judgments and tradeoffs made." Afghan Am., 90 Fed. Cl. at 360 (internal quotation marks omitted); see One Largo, 109 Fed. Cl. at 97 (stating that because a best value determination "involves layers of decision-making and judgment calls regarding which proposals offer the overall highest technical merit, and what technical advantages are worth a higher price[,] [t]he court is reluctant to second guess" this determination). However, if "a procurement decision is without a rational basis or is based upon a clear violation of law, that decision must be set aside." FirstLine, 100 Fed. Cl. at 376.

Pursuant to the Solicitation and FAR 15.308, the SSA conducted a comparative assessment of Entwistle's proposal against each of the other offerors' proposals. See AR

1880-1905 (SSDD).  The SSA stated that he "compared the proposals utilizing a 'trade-off' process, giving appropriate consideration to the evaluation criteria set forth in the RFP and their relative importance."  Id. at 1878.  Based on these comparisons, the SSA determined that Entwistle's proposal represented the best value to the Agency and that, accordingly, award should be made to Entwistle.  Id. at 1908.

In his comparison of the proposals of Entwistle and Mil-Mar, the SSA found that Mil-Mar's proposal was "more advantageous" than Entwistle's proposal in the two non-price factors.  Id. at 1900; see also id. ("Clearly, Mil-Mar has advantages in the two most important factors when compared to Entwistle.").  However, the SSA concluded that Entwistle's proposal represented a "better value" to the Agency.  Id.  The SSA reasoned that "despite the Non-Price Factors being more important than the Price Factor[,] the advantages offered by Mil-Mar in the Production Capability and Experience factors are, simply stated, not worth the payment of a $[* * *] or [* * *]% premium in price."  Id.  Notwithstanding the fact that "the Entwistle proposal has more risk than Mil-Mar's and fewer advantages with respect to the Non-Price Factors," the SSA found that Entwistle "has the capacity to provide for timely delivery of supplies in satisfaction of contract requirements and that it will successfully meet contract requirements based upon its prior experience."  Id. at 1900-01.

Plaintiff contends that "the best value analysis performed by the SSA was both irrational and inconsistent with the evaluation scheme set forth in the RFP."  Pl.'s Mot. 32.  Specifically, plaintiff argues that "the SSA failed to perform a comparative analysis of the proposals," id. (capitalization and emphasis omitted), the SSA "violated the documentation requirement of FAR [] 15.308," id. at 34, and "the SSA's best value trade-off was inconsistent with the Solicitation's factor weighting scheme," id. at 35 (capitalization and emphasis omitted).

Defendant counters that "[t]he SSA thoroughly compared Entwistle's proposal to that of every other offeror with respect to each of the three evaluation factors before concluding, entirely reasonably, that Entwistle offered the best value to the Government."  Def.'s Mot. 40.  According to defendant, "[t]he SSA's determination that the lower risk presented by Mil-Mar's proposal simply did not justify the payment of an additional $[* * *] is a quintessential business judgment, one entrusted to the agency's discretion."  Id. at 43; see also id. at 40 ("The agency rationally and permissibly concluded and adequately explained that the benefits offered by Mil-Mar did not warrant payment of a [* * *]% price premium[.]" (capitalization and emphasis omitted)).  Defendant argues that plaintiff "falls far short of the threshold that must be cleared in order to demonstrate that a best-value analysis was arbitrary and capricious."  Id. at 41.

The court now provides a summary of the SSA's comparative assessment of the proposals submitted by Entwistle, the lowest-priced offeror, and Mil-Mar, the highest-rated offeror, and then addresses the parties' arguments.  For the reasons stated, the court

finds that the Agency's best value trade-off analysis had a rational basis and was consistent with the Solicitation's evaluation scheme.

1.    The SSA's Comparative Assessment of the Proposals Submitted by Entwistle and Mil-Mar

In making his best value determination, the SSA "considered and relied upon" the SSEB's adjectival ratings and final evaluations of the proposals.  AR 1878 (SSDD).  A chart summarizing the adjectival ratings assigned to Entwistle and Mil-Mar for the two non-price factors and their respective considerations, along with their total evaluated prices, is below:

| Factors and Considerations | Entwistle | Mil-Mar |
|---|---|---|
| Production Capability | Good | Outstanding |
| Manufacturing Facilities | Moderate Risk | Very Low Risk |
| Key Tooling and Equipment | Low Risk | Very Low Risk |
| Production Approach | Very Low Risk | Very Low Risk |
| Time Phased Critical Path | Very Low Risk | Moderate Risk |
| Letters of Commitment | Very Low Risk | Very Low Risk |
| Experience | Relevant | Very Relevant |
| Comparable Items | Very Low Risk | Very Low Risk |
| Technical Manuals | Moderate Risk | Very Low Risk |
| Delivery | Moderate Risk | Very Low Risk |
| Low Temp Requirement | Low Risk | Very Low Risk |
| Welding | Moderate Risk | Very Low Risk |
| Price | $69,063,943 | $[* * *] |

See AR 1879 (SSDD) (identifying evaluation considerations for the two non-price factors and summarizing the SSEB's evaluations); AR 1737, 1744 (Mil-Mar's Final Evaluation Report); AR 1755, 1763 (Entwistle's Final Evaluation Report).  The SSA stated that that he "agree[d] with the assessments of the SSEB" and that his best value determination "represent[ed] [his] independent judgment."  AR 1878 (SSDD).  The SSA also stated that his "comparative assessment . . . summarizes the rationale for [his] business judgments and the tradeoffs made in [his] decision."  Id.  The SSA's comparative assessment of Entwistle against each offeror, including Mil-Mar, consisted of comparisons made under each of the three factors--Production Capability, Experience and Price--and a concluding section in which the SSA further explained his best value determination.  See id. at 1880-1905.

In his comparison of the proposals of Entwistle and Mil-Mar regarding the Production Capability factor, the SSA concluded that Mil-Mar's proposal was "more advantageous and . . . provide[d] a slightly lower risk of unsuccessful performance

than . . . Entwistle['s] proposal." Id. at 1898. The SSA therefore rated Mil-Mar's proposal as outstanding and Entwistle's proposal as good. Id. In reaching this conclusion, the SSA addressed the ratings both offerors received by the SSEB for each of the five considerations associated with the Production Capability factor (manufacturing facilities, key tooling and equipment, production approach, time phased critical path and letters of commitment) and explained why he agreed with each rating. See id. at 1897-98. For example, the SSA provided the following comparative assessment of Entwistle's and Mil-Mar's proposals with respect to the manufacturing facilities and time phased critical path considerations:

> Regarding the Manufacturing Facility consideration, Entwistle's proposal provided sufficient information regarding existing manufacturing facilities, including dimensions, to provide confidence that it has the manufacturing facilities to provide for timely delivery of supplies. Although a moderate risk was ascribed to Entwistle's proposal because it lacked information regarding the lead-time needed to convert a paint booth into a passivation booth, I have determined that the risk attributable to that lack of information can be easily mitigated as explained in more detail above in the Entwistle and [* * *] comparison.[54] Mil-Mar's proposal is very low risk

---

[54] In his comparative assessment of the proposals submitted by Entwistle and [* * *], the SSA discussed in more detail the moderate risk rating assigned to Entwistle as a result of Entwistle's failure to provide information "regarding the lead-time needed to convert a paint booth into a passivation booth":

> In properly assessing [Entwistle's] risk and its mitigation, I consulted with the systems engineer for a similar water tank system, the systems engineer for a water packaging system, and with subject matter experts from TARDEC's Center for Ground Vehicle Development and Integration. . . . First, per the purchase description, only the inside (wetted surfaces) of the HIPPO must be passivated, and passivation is to be done by treatment with an acid solution. The system engineer for a similar water tank system informed me that the inside of that tank is passivated by pumping an acid solution into the tank, then back into a holding tank. Further, the systems engineer for a water packaging system shared pictures and video of a water tank passivation process. In this case, a worker donned appropriate personal protective equipment and sprayed the inside of the tank. This was done not in a paint booth, but in an open bay. Second, passivation can be done with citric or nitric acid. If citric acid is used, no special ventilation is required. If nitric acid is used, the ventilation system must be capable of handling acidic vapors, which requires polyvinyl chloride (PVC) or polypropylene duct work and acid scrubbers. There are several types of scrubbers, and a simple water-fed plate scrubber is suitable.

because it provides for use of current HIPPO production facilities and the use of Mil-Mar's current subcontractor for the tank and ISO frame.

. . . .

Regarding the <u>Time Phased Critical Path</u> (<u>TPCP</u>) consideration, Entwistle's very low risk TPCP addressed all of the seven milestones specified in the RFP. The company's TPCP also included risk identification and mitigation concerning the required establishment of a [* * *] and timely performance of required [* * *]. On the other hand, Mil-Mar's proposal is assessed as [* * *].

<u>Id.</u> (footnote added). Based on his comparative assessment of each of the five considerations, the SSA concluded that, although Entwistle's risks were low and he had "confidence that Entwistle ha[d] the capacity to provide for timely delivery of supplies," Mil-Mar had the "advantage in the most important Factor" because Mil-Mar was "using the proposed production facilities for the current HIPPO production contract, has sufficient tooling and equipment, and has a strong supplier base." <u>Id.</u> at 1898.

In his comparative assessment of the Experience factor, the SSA found "Mil-Mar's Very Relevant Experience Factor proposal, which included advantages stemming in large part from its experience in producing the current configuration of the HIPPO, to be more advantageous and lower in risk than Entwistle's Relevant Experience Factor proposal, which include[d] risks in technical manual, delivery and welding experience." <u>Id.</u> at 1900. In reaching this conclusion, the SSA addressed the ratings both offerors received from the SSEB for each of the five considerations associated with the Experience factor (comparable items, technical manuals, delivery, low temperature requirement and welding) and explained why he agreed with each rating. <u>See</u> <u>id.</u> at 1899-00. For example, the SSA provided the following comparative assessment of Entwistle's and Mil-Mar's proposals with respect to the comparable items and welding considerations:

Regarding <u>Comparable Items</u>, the proposals from both offerors are assessed as providing a very low risk based on experience gained on contracts cited in their respective proposals in supplying sanitary liquid handling and storage systems of a complexity comparable to the HIPPO. The risk assessment assigned to Entwistle is based on the combined experience gained by that company and its identified subcontractor from the five contracts cited in its proposal. The production efforts collectively involve the major elements of a sanitary liquid handling and storage system similar

---

AR 1880 (SSDD). Based on these considerations, the SSA found that Entwistle's [* * *] "should require minor modifications and modest capital investment," and that "the moderate risk of Entwistle's proposal [could] be easily mitigated." <u>Id.</u>

to those required by the HIPPO, including stainless steel potable water tanks, as well as plumbing systems comprised of tanks, pumps, hoses, valves, and fittings and designed to convey both potable and non-potable water, and skid-based platform with frame. I further agree with this very low risk assessment because experience with the major elements of a HIPPO system is a larger risk mitigator than the experience with integration of the elements into a complete system. Similarly, Mil-Mar's proposal is very low risk because the contracts cited in the proposal involve the production of end items nearly identical to the end items to be procured pursuant to the proposed contract. While the proposals from both Mil-Mar and Entwistle were assessed as very low risk, I find the Mil-Mar proposal to be slightly more advantageous where its experience is essentially identical to the HIPPO.

. . . .

Regarding Welding Stainless Steel, Entwistle's proposal is moderate risk because it provided experience for welding in two of the contracts cited in the proposal, although the referenced welding was to requirements somewhat different than the HIPPO's [American Welding Society (AWS)] D18.3/18.3M requirement. In comparison, Mil-Mar's very low risk proposal provides an advantage with respect to this consideration in that two of the five contracts cited by Mil-Mar provide experience in welding stainless steel in compliance with AWS D18.3/18.3M.

Id.; cf. supra Part III.B.2 (discussing the SSEB's evaluation of Entwistle's experience).

In his comparative assessment of the Price factor, the SSA simply concluded that Entwistle's proposal was "significantly more advantageous" than that of Mil-Mar, "where Mil-Mar's total evaluated price of $[* * *] is $[* * *] or [* * *]% higher than Entwistle's total evaluated price of $69,063,943." AR 1900 (SSDD).

The SSA's comparative assessment of the proposals of Entwistle and Mil-Mar concluded with a two-paragraph explanation of why the SSA considered Entwistle's proposal to be a better value to the Agency. See id. at 1900-01. The SSA first noted that Section M of the Solicitation provided that "price may be controlling when the advantages of a higher rated, higher price proposal are not considered to be worth the price premium." Id. (alteration and internal quotation marks omitted); cf. supra Part I.A.2 (discussing Section M of the Solicitation). The SSA considered this to be "the case here," stating that "[it] is well worth it to the Government to pay over $[* * *] less for Entwistle's proposal." AR 1900 (SSDD); see id. (stating that "the advantages offered by Mil-Mar in the Production Capability and Experience factors are, simply stated, not worth the payment of a $[* * *] or [* * *]% premium in price"). The SSA further stated

that although Entwistle's proposal offers fewer advantages under the two non-price factors and has more risk associated with it than Mil-Mar's, "Entwistle still gives the Government confidence that it has the capacity to provide for timely delivery of supplies in satisfaction of contract requirements and that it will successfully meet contract requirements based upon its prior experience." Id. at 1900-01.

The SSA then summarized his findings with respect to the two non-price factors. Under the Production Capability factor, the SSA observed that Mil-Mar "[c]learly" offered the Agency "more advantages . . . because it is the current producer of the HIPPO" but found that these advantages did "not significantly outweigh the advantages provided by Entwistle's low risk proposal." Id. at 1901. The SSA also stated that he had confidence in Entwistle's "low risk Production Capability proposal" because "Entwistle has shown that it has the manufacturing facilities, the key tooling and equipment, the production approach, the time phased critical path, and the letter[s] of commitment." Id.

As to the Experience factor, the SSA found that "[t]he advantages in Mil-Mar's favor in the Experience factor are greater than in the Production Capability factor" and that "Mil-Mar's experience as the current producer of HIPPOs results in less risk to the Government." Id. However, the SSA did not consider Mil-Mar's advantages in the Experience factor to be "overwhelming." Id. The SSA then described his findings with respect to Entwistle's experience, which, according to the SSA, gave him "confidence that [Entwistle could] successfully perform the effort." Id. The SSA noted that [* * *] had experience delivering items "at rates approaching 35 per month," that Entwistle "ha[d] experience with the comparable items and the low temperature requirement considerations" and that Entwistle had "some experience" with the welding and technical manual considerations. Id. The SSA further noted that, "[w]here Entwistle did have applicable experience, it entailed situations that involved many of the same requirements as the HIPPO [technical manual] requirements, including [technical manual] content on addressing maintenance, operation and illustrated parts breakdowns." Id.

Based on the foregoing, the SSA concluded that "[t]he advantages provided by the Mil-Mar proposal in the Production Capability factor and in the Experience factor are not enough to overcome the $[* * *] in savings to the Government available from Entwistle's proposal, which is still a low risk proposal." Id. That is, the SSA found the [* * *]% price premium required by Mil-Mar's proposal to be significant and did not find that the advantages of Mil-Mar's proposal "outweigh[ed] the significant savings afforded to the Government by Entwistle's low risk Production Capability proposal with its Relevant Experience rating. In other words, the differences between Mil-Mar's very low risk proposal and Entwistle's low risk proposal [were] not significant enough to justify such a price premium." Id.

2.      The SSA Performed an Adequate Comparative Assessment of the Proposals

Plaintiff first argues that, "[a]lthough the SSA mentioned the adjectival ratings, recited the facts that resulted in the weaknesses assessed to Entwistle's proposal, and recited the strengths found in Mil-Mar's proposal, he never actually conducted a true comparative analysis of the two proposals." Pl.'s Mot. 33 (citing TRW, Inc., 68 Comp. Gen. 511 (1989))[55]; cf. FAR 15.308 (requiring the SSA's best value decision to "be based

_____

[55]   Plaintiff cites TRW, Inc., 68 Comp. Gen. 511 (1989), for the proposition that "it [is] not enough for the SSA to 'consider' that the offerors were evaluated as having certain strengths, the SSA [is] required to conduct a comparative analysis of the strengths to justify his cost/technical tradeoff decision," Pl.'s Mot. 33.  The court agrees with the substance of this proposition and finds in this section that the Agency did, in fact, conduct a comparative analysis of the strengths (and weaknesses) of the proposals submitted by Entwistle and Mil-Mar.  The comparison conducted in TRW, Inc. is distinguishable from the comparison made in this case.

TRW, Inc. involved a protest by TRW, Inc. (TRW), the highest-rated, higher-priced offeror, over the award of a contract by the United States Air Force (Air Force) to GTE, Government Systems Corporation (GTE), the lowest-rated and lowest-priced offeror.  See TRW, Inc., 68 Comp. Gen. at 512-13.  The RFP at issue "advised offerors that this was 'a technical competition with cost considered subordinate to other factors.'"  Id. at 512.  Despite the fact that the technical evaluation team found that GTE "ha[d] significant technical deficiencies and [was] considered high risk for several items," id. at 513 (internal quotation marks omitted), the SSA determined, "based upon an 'integrated assessment,'" that GTE provided the best value to the government, id. at 514.  Apart from listing several strengths associated with GTE's technical proposal, the SSA did not provide any reasons for his best value determination.  Id.  Moreover, the SSA did not address "the more numerous" weaknesses associated with GTE's technical proposal and "did not discuss the technical ratings of the other proposals, including TRW's significantly superior . . . proposal."  Id.

The Comptroller General found that the SSA's statement "that he made an 'integrated assessment' and that his decision considered technical risks and costs . . . f[e]ll far short of the requirement to justify cost/technical tradeoff decisions."  Id.; see id. at 515 ("[T]he source selection decision does not explain how GTE's low cost offsets its relatively low technical and high risk ratings.").  The Comptroller General concluded that, in light of TRW's "significant . . . technical superiority" and GTE's weaknesses, "the absence of a justification [by the SSA] indicate[d] that no tradeoff analysis was made and that the Air Force effectively made cost more important than technical considerations, notwithstanding the RFP statement that technical factors were most important."  Id. at 514.

Here, however, both the SSEB and the SSA found Entwistle's proposal to be low risk and did not identify any significant technical deficiencies associated with Entwistle's proposal. See supra Part III.E.1.  The SSEB and the SSA also addressed the weaknesses associated with Entwistle's proposal and the strengths associated with Mil-Mar's proposal.  See supra Part III.E.1.  Finally, the SSA explained his best value determination and justified his cost and technical tradeoff decision.  See Part III.E.1-3.

on a comparative assessment of proposals against all source selection criteria in the solicitation"). According to plaintiff, the SSA's trade-off analysis "fails to explain why the differences in the ratings assigned to the proposals were insignificant . . . [and] fails to explain why the numerous strengths assigned to Mil-Mar's proposal were given negligible weight." Pl.'s Mot. 34. Plaintiff contends that, without these explanations, "the SSA's conclusion that Mil-Mar's proposal was only 'more advantageous' than Entwistle's proposal is arbitrary and capricious." Id.

In support of its position, plaintiff points out that Mil-Mar was rated higher than Entwistle in both of the non-price factors and in six of the ten considerations. Pl.'s Mot. 33. Plaintiff contends that the SSA merely recited the ratings and offered "conclusory statement[s]" about whether the ratings reflected an advantage or disadvantage. Pl.'s Resp. 17. According to plaintiff, this "demonstrates that the SSA failed to recognize the superiority of Mil-Mar's proposal," and supports plaintiff's contention "that the SSA never conducted a true comparative analysis." Id. Plaintiff also notes that the SSBB identified [* * *] strengths and [* * *] weakness in Mil-Mar's proposal in comparison to the five strengths and four weaknesses identified in Entwistle's proposal.[56] See Pl.'s Mot. 33; cf. AR 1738, 1745 (Mil-Mar's Final Evaluation Report); AR 1755-56, 1764 (Entwistle's Final Evaluation Report). Plaintiff argues that the SSA failed to discuss "the extent of the strengths in Mil-Mar's proposal as compared to Entwistle's proposal," and failed to explain "why Mil-Mar's strengths would not provide a meaningful benefit to the Government." Pl.'s Mot. 33.

Defendant counters, and the court agrees, that plaintiff's "conclusory assertion that the SSA never actually conducted a true comparative analysis of Mil-Mar's proposal and Entwistle's cannot be reconciled with the SSA's actual decision." Def.'s Mot. 41 (internal quotation marks omitted). The record supports that the SSA's best value determination was "based on a comparative assessment of proposals against all source selection criteria in the solicitation." Cf. FAR 15.308. As defendant correctly states, "the SSA reviewed each and every consideration relevant to the non-price evaluation factors, noted the rating given to each offeror as to that consideration, . . . explained the substantive basis for that rating," and "explained which offeror was considered to offer a greater advantage to the Government and why." See Def.'s Mot. 41; cf. supra Part III.E.1 (discussing the SSA's comparative assessment of the proposals submitted by Entwistle and Mil-Mar). The court also finds that the SSA discussed in detail the strengths and weaknesses of the proposals submitted by Entwistle and Mil-Mar and highlighted Mil-Mar's advantages and the benefits they would provide to the Agency. See supra Part III.E.1 (discussing the SSA's comparative assessment of the proposals submitted by Entwistle and Mil-Mar); infra Part III.E.3 (finding that the SSA sufficiently documented his best value determination). That is, in his assessment of the differences between the two proposals submitted, the SSA considered not only the proposals' adjectival ratings

---

[56] [* * *].

but also the advantages and disadvantages associated with each of the proposals.  Cf. Femme, 83 Fed. Cl. at 758 (stating that, in addition to adjectival ratings, the SSA should consider information on advantage and disadvantages of the proposals in his evaluation).

3.      The SSA's Best Value Trade-Off Analysis Was Sufficiently Documented

Plaintiff next argues that "the SSA's best value analysis included 'nothing more than a selective summary of the ratings, strengths, and weaknesses assigned to the proposals by lower-level evaluators,'" Pl.'s Mot. 34 (quoting FirstLine, 100 Fed. Cl. at 380), and that, therefore, "the best value tradeoff was insufficiently documented, in violation of FAR 15.308," id. at 34-35; cf. FAR 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.").  Although plaintiff concedes that the SSA discussed "whether the Agency should pay a 'significantly' higher price for a proposal it deemed only 'more advantageous' than Entwistle's lower-priced proposal," plaintiff contends that the SSA's "analysis contains nothing more than conclusory assertions."  Pl.'s Mot. 34 (citing AR 1900-01 (SSDD)); see also id. ("The SSA summarily concluded, without any real analysis of the benefits presented by Mil-Mar, that these technical benefits did not warrant the payment of the price premium.").[57]

Defendant counters that, notwithstanding plaintiff's contentions to the contrary, "the bases for the SSA's decision, and their reasonableness, are perfectly apparent from the decision document."  Def.'s Mot. 42; see also id. ("Mil-Mar's complaints about the SSA's documentation of his decision amount only to conclusory assertions that the documentation was insufficient, without any specific references to the decision itself.").  The court agrees.

The court recognizes that "when selecting a low-price technically inferior proposal in a best-value procurement where non-price factors are more important than price, it is not sufficient for the [SSA] to simply state that a proposal's technical superiority is not worth the payment of a price premium"; rather, the SSA "must explain specifically why it does not warrant a premium."  See FirstLine, 100 Fed. Cl. at 381; cf. Pl.'s Mot. 34 (invoking this language).  Here, the court finds that the SSA's comparative assessment of

---

[57]  Plaintiff also contends that "[w]hile the SSA may have considered the non-price factors and noted the ratings given to each offeror, he never explained why Entwistle offered a greater advantage to the Government other than its significantly low price."  Pl.'s Resp. 16-17. Defendant counters that "the SSA was not required to identify any other advantage presented by Entwistle other than its 'significantly low price'[][because] the solicitation expressly provided that price could become 'controlling when . . . [t]he advantages of a higher rated, higher price proposal are not considered to be worth the price premium."  Def.'s Reply 9 (second alteration and omission in original) (quoting AR 277 (RFP)).  The court addresses this issue below.  See infra Part III.E.4.

the proposals of Entwistle and Mil-Mar were not mere "[c]onclusory statements, devoid of any substantive content." Cf. Serco Inc., 81 Fed. Cl. at 497. The record shows that the SSA adequately documented his business judgments and trade-offs and adequately explained why Mil-Mar's technical advantages did not warrant payment of a $[* * *] price premium. See supra Part III.E.1-2 (discussing the SSA's comparative assessment of the proposals submitted by Entwistle and Mil-Mar and finding it adequate).

As defendant notes, the two technical factors "were intended to gauge the likelihood that each offeror would successfully perform the Hippo contract--or, phrased another way, the risk that each offeror would not successfully perform." Def.'s Mot. 42. The SSA recognized and acknowlged both Mil-Mar's technical advantages and the lower risk associated Mil-Mar's proposal. See, e.g., AR 1898 (SSDD) (finding, under the Production Capability factor, that Mil-Mar's proposal was "more advantageous and . . . slightly lower [in] risk" than Entwistle's proposal because Mil-Mar was "using the proposed production facilities for the current HIPPO production contract, has sufficient tooling and equipment, and has a strong supplier base); id. at 1900 (finding, under the Experience factor, that Mil-Mar's proposal was "more advantageous and lower in risk than Entwistle's" proposal because Mil-Mar had "experience in producing the current configuration of the HIPPO"); see also supra Part III.E.2 (finding that SSA discussed in detail Mil-Mar's strengths and highlighted Mil-Mar's advantages and the benefits they would provide to the Agency). However, the SSA also explained that the difference in the risks between the two proposals was not significant enough to overcome the price premium, see AR 1901 (SSDD), and the court finds well-documented the SSA's determination that Entwistle's low risk proposal was the best value to the Agency, see supra Part III.E.1 (discussing the SSA's comparative assessment of the proposals submitted by Entwistle and Mil-Mar); see also supra Part III.E.2 (agreeing with defendant that "the SSA reviewed each and every consideration relevant to the non-price evaluation factors, noted the rating given to each offeror as to that consideration, . . . explained the substantive basis for that rating, and explained which offeror was considered to offer a greater advantage to the Government and why" (internal quotation marks omitted)).

> 4.    The SSA's Best Value Trade-Off Analysis Was Consistent with the Solicitation's Factor Evaluation Scheme

Plaintiff's final argument is that the Agency "converted this best value procurement into a technically acceptable, low-price procurement."[58] Pl.'s Mot. 35.

---

[58] In a lowest price technically acceptable procurement, "[p]roposals are evaluated for [technical] acceptability but not ranked using the non-cost/price factors." FAR 15.101-2(b)(3). This type of procurement "is appropriate when best value is expected to result from selection of the technically acceptable proposal with the lowest evaluated price," and "[t]radeoffs are not permitted." FAR 15.101-2(a), (b)(2); see Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 349 n.22 (2009) (stating that, in a lowest price technically acceptable procurement, award is

According to plaintiff, the SSA increased the importance of the Price factor by "inflat[ing] the technical portion of Entwistle's lowest-priced proposal and downplay[ing] the technical superiority of Mil-Mar and the other offerors' higher-priced proposals," id., and "[s]uch action is evidence of his desire to award the contract to the lowest-priced offeror that met a minimum level of technical acceptability," Pl.'s Resp. 18 (citing Femme, 83 Fed. Cl. at 770). Plaintiff maintains that, in contravention of the Solicitation, the SSA considered price "the predominate basis for award," Pl.'s Mot. 35; see Pl.'s Resp. 18 ("[T]he SSA's best value tradeoff accorded price more weight than the RFP permitted."), and that, therefore, the SSA's "best value analysis was irrational and contrary to law," Pl.'s Mot. 36 (citing FAR 15.305(a)).

The court finds that plaintiff's reliance on Femme is inapposite. In Femme, this court found that the SSA's best value analysis was improper in part because the SSA evidenced an "intent to inflate the technical portions of the low-price offerors' proposals and downplay the technical superiority of the higher-priced offerors' proposals." Femme, 83 Fed. Cl. at 767-68. In particular, the Femme court observed that the SSA "went out of her way to undercut the superior technical evaluations of the higher-priced proposals" by "prais[ing] the merits of lower-rated [lower-priced] proposals . . . , but steadfastly declin[ing] to praise the merits of lower-rated [higher-priced] proposals." Id. at 768-69. The Femme court also noted that the SSA "emphasized the nature, quality, and extent of a proposal's strengths when it benefitted a lower-priced proposal but often ignored the nature, quality, and extent of a proposal's strengths and relied instead on the . . . ratings when a higher-priced proposal was found to be superior." Id. at 769.

Here, the record does not indicate that the SSA manifested any "intent to inflate the technical portions of" Entwistle's proposal or to "downplay the technical superiority of" Mil-Mar's proposal. Cf. id. at 768. Instead, the SSA repeatedly highlighted Mil-Mar's technical advantages and also repeatedly noted the lower risk associated with Mil-Mar's proposal. See supra Part III.E.1-2 (discussing the SSA's comparative assessment of the proposals submitted by Entwistle and Mil-Mar and finding it adequate). The SSA also addressed each of Entwistle's weaknesses. See id. In the instances in which the SSA determined that a risk associated with Entwistle's proposal could be mitigated, the SSA provided a reasoned and rational basis for his decisions. See, e.g., AR 1897 (finding that the "moderate risk" rating assigned to Entwistle under the manufacturing facilities consideration could be mitigated). Because the court finds that the SSA conducted an adequate comparative assessment of proposals, see supra Part III.E.2, sufficiently documented his best value determination, see supra Part III.E.3, and made this determination consistent with the evaluation factors set forth in the Solicitation, the court will not substitute its judgment for that of the Agency, cf. Afghan Am., 90 Fed. Cl. at 360

"made to the offeror with the 'lowest evaluated price' and a proposal 'meeting or exceeding the acceptability standards for non-cost factors'" (quoting FAR 15.101-2(b)(1)).

("The Court will not disturb a best-value award so long as the agency documents its final award decision and includes the rationale for any business judgments and tradeoffs made." (internal quotation marks omitted)).

Plaintiff further argues that, in addition to "[t]he SSA's numerous references to Mil-Mar's price," the language used by the SSA in his analysis illustrates that the SSA considered price to be more important than the two non-price factors. Pl.'s Mot. 35-36. Specifically, plaintiff points to the following statements as evidence that "price became the predominant factor for award":

> "[T]he advantages offered by Mil-Mar in the Production Capability and Experience factors are, simply stated, not worth the payment of a $[* * *] or [* * *]% premium in the price"; "price may be controlling when '[t]he advantages of a higher rated, higher price proposal are not considered to be worth the price premium'"; "it is well worth it to the Government to pay over $[* * *] less for Entwistle's proposal"; and "not enough to overcome the $[* * *] in savings to the Government available from Entwistle's proposal."

Id. at 35 (second alteration in original) (quoting AR 1900-01 (SSDD)). Plaintiff contends that the foregoing indicates that the SSA "improperly converted the source selection from one emphasizing technical superiority and skills . . . to one based upon technical acceptability and low price." Id. at 35-36.[59]

The Solicitation explicitly provided, however, that "price may be controlling when . . . [t]he advantages of a higher rated, higher price proposal are not considered to be worth the price premium." AR 277 (RFP). Therefore, as defendant correctly contends, "to the extent the agency did accord price controlling weight, it was permitted to do so." See Def.'s Reply 9; cf. Serco Inc., 81 Fed. Cl. at 497 (cautioning against

---

[59] Plaintiff also claims that "the SSA's statement that Entwistle's proposal 'gives the Government confidence that it has the capacity to provide for timely delivery of supplies in satisfaction of contract requirements and that it will successfully meet contract requirements based upon its prior experience'" is the type of language often used in lowest-price technically acceptable procurements. Pl.'s Mot. 35 (quoting AR 1901 (SSDD)). Although there may be support for plaintiff's argument, see FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 377 (2011) ("[T]he relevant question is not whether the lowest-priced proposal will meet the minimum technical requirements set forth in the RFP; rather, the government must determine which proposal represents the best value to the government."), the court does not find that the Agency's use of this language warrants disrupting the award to Entwistle, cf. Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 622 (2002) ("[M]inor errors or irregularities, i.e., harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision.").

"mak[ing] a nominal technical advantage essentially determinative, irrespective of an overwhelming price premium" (internal quotation marks omitted)).[60]

IV.    Conclusion

For the foregoing reasons, plaintiff's Motion is DENIED, and the Motions of defendant and intervenor are GRANTED.  The Clerk of Court shall enter judgment for defendant.  No costs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge

---

[60]    If plaintiff wishes to contest this term of the Solicitation, plaintiff should have objected to this term prior to the close of bidding.  Cf. Blue & Gold, 492 F.3d at 1313 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

## EXHIBIT A

## Table of Contents

I.    Background........................................................................................... 3

    A.    The Solicitation............................................................................. 3

        1.    Section L of the Solicitation:  Instructions, Conditions and Notices to Offerors.................................................................................. 5

        2.    Section M of the Solicitation:  Evaluation Factors for Award.......... 6

    B.    Responses to the Solicitation and the SSEB's Evaluation of Proposals....... 8

    C.    Requests for Clarification.............................................................. 9

    D.    Price Evaluation Reports............................................................... 10

        1.    The Initial Price Evaluation Report.................................................. 10

        2.    The Entwistle Price Evaluation Report and Addendum to the Entwistle Price Evaluation Report...................................................... 11

        3.    The Final Price Evaluation Report.................................................... 13

    E.    Best Value Analysis and Contract Award....................................... 13

    F.    Procedural History........................................................................ 14

II.   Legal Standards.................................................................................... 14

    A.    Jurisdiction.................................................................................. 14

    B.    Motion for Judgment on the Administrative Record................................ 15

    C.    Standard of Review....................................................................... 16

        1.    The Plaintiff Must Establish Error.................................................... 16

        2.    The Plaintiff Must Establish Prejudice............................................. 18

III. Discussion.............................................................................................................. 18

    A.    Plaintiff Has Standing to Bring This Protest............................................... 18

    B.    The Agency Treated the Offerors Equally and Rationally in Its Evaluation of Experience.................................................................................. 20

        1.    The Experience of Entwistle, [* * *], [* * *] and [* * *]................ 21

        2.    The Agency's Evaluation of the Experience of Entwistle, [* * *], [* * *] and [* * *].......................................................................... 24

        3.    The Agency Treated Offerors Equally and Rationally in Its Evaluation of Experience................................................................ 27

    C.    The Agency Did Not Conduct Improper, Unequal Discussions................. 33

    D.    The Agency's Price Realism Analysis Was Rationally Based................... 41

        1.    The Agency's Comparison Techniques for Material Costs Was Rationally Based.............................................................................. 46

        2.    The Agency's Evaluation of the Frame Was Rationally Based...... 49

        3.    The Agency's Comparison of Labor Hours Was Rationally Based. ................................................................................................ 53

    E.    The Agency's Best Value Trade-Off Analysis Was Rationally Based and Consistent with the Solicitation's Evaluation Scheme............................... 58

        1.    The SSA's Comparative Assessment of the Proposals Submitted by Entwistle and Mil-Mar.................................................. 62

        2.    The SSA Performed an Adequate Comparative Assessment of the Proposals................................................................................. 66

        3.    The SSA's Best Value Trade-Off Analysis Was Sufficiently Documented................................................................................... 69

        4.    The SSA's Best Value Trade-Off Analysis Was Consistent with the Solicitation's Factor Evaluation Scheme.......................... 70

IV. Conclusion............................................................................................................. 73